IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Craig B. Schaffer**

Civil Action No. 10-cv-00189-PAB-CBS

LORI L. PARK

      Plaintiff,

        v.

**FISERV TRUST COMPANY,**
**FISERVISS,**
**FISERV INC.,**
**LINCOLN TRUST COMPANY,**
**TRUST INDUSTRIAL BANK HOLDINGS, INC.,**
**ROBERT BERIAULT HOLDINGS, INC.**

      Defendant's.

**RECEIVED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 2 1 2010

GREGORY C. LANGHAM
CLERK

---

## TITLE VII 3rd AMENDED COMPLAINT

---

### PARTIES

    1.  Plaintiff Lori Park is a female citizen of Denver County Colorado who presently resides at 1120 32nd Street, Unit 101, Denver, CO 80205

    2.     Defendant's is a "person" within the meaning of 42 U.S.C. § 2000e(a) and Defendant's is an "employer" within the meaning of Title VII within the meaning of 42 U.S.C. § 2000e(b)(g)(h), 42 U.S.C. § 12111(5)(a), covered entity under 42 U.S.C. §12111(2).

    3.     Defendant's Fiserv, Inc. 255 Fiserv Drive, Brookfield, WI 53045 is a corporation organized under the laws of the State of Wisconsin. Fiserv, Inc. is a publicly traded company engaged in the business of providing information and management systems to the financial services and insurance industry. Since 2005, Fiserv, Inc. is and or was the sole owner of Fiserv

Page 2   Civil Action No. 10-cv-00189-PAB-CBS

Trust Company, and Trust Industrial Bank ("TIB"). **Exhibit 1 & 2**

4.      Defendant's TIB incorporated on or about 12/5/00 and on or about 11/3/08

changed from TIB to Lincoln Trust Company and on or about 11/17/09 which name changed

from LTC back to TIB of Denver, CO and name change on or about 12/1/09 to Trust Industrial

Bank Holdings, Inc. which principal address changed on or about 12/4/09 to 255 Fiserv Drive,

Brookfield, WI 53045.  Ms. Park performed trading for Fiserv Trust Company and/or TIB

Industrial Bank, Inc.  FTC and TIB are and/or was custodial and trust subsidiaries of Fiserv, Inc.

5.      Defendant's Fiserv Trust Company ("FTC") was a corporation organized and

licensed under the Laws of the State of Colorado and changed its trade name to Lincoln Trust

Company on or about 2/25/05 and changed its entity name to Lincoln Trust Company on

11/5/07.  At relevant times, FTC was a Fiserv, Inc. subsidiary.  Ms. Park performed Trading

activities from May 2007 to end of May 2008 for both entities.  FTC then merged on or about

8/18/08 to TD Ameritrade Trust Company, a Maine corporation with principal address in

Columbia, MD and of which Ms. Park provided trading back office support.

6.      Defendant's Lincoln Trust Company ("LTC") is and was, at relevant times, a

corporation organized and licensed under the laws of the State of Colorado and Fiserv Trust

Company changed its entity name on or about 11/5/07 to Lincoln Trust Company per State-

ment of Merger.   On or about 11/3/08, TIB changed its name to LTC.  LTC's principal place

of business is 717 17th Street, St 2100 Denver CO 80202.  Ms. Park executed trades for LTC.

Ms. Park's 2008 W-2 reflects Lincoln Trust as the corporation who filed her W-2 with the IRS.

7.      Defendant's Robert Beriault Holdings, Inc. ("RBH Inc.") is and was at relevant

times, a Corporation organized and licensed under the laws of the State of Colorado.  This

Page 3   Civil Action No. 10-cv-00189-PAB-CBS

company was wholly owned by Robert Beriault ("Beriault"), a Fiserv officer and President of

Fiserv Investment Support Services, ("FiservISS") which Ms. Park was originally employed by

as of 4/2/07, of which operated FTC and of which Ms. Park traded Mutual Funds through.  On

5/24/07, Beriault reached an agreement to purchase TIB and his former division.  Beriault,

therefore had control over TIB.  On or about 2/4/08, NTC and TIB took over FTC of

which Ms. Park made Mutual Fund Trades  RBH, Inc.'s principal place of business is 717 17th

Street, St 2100 Denver CO 80202 and is the legal successor by merger or otherwise.

8.      Defendant's FiservISS is a unit of Fiserv, Inc.  FiservISS was formed in 2004,

when First Trust Corporation, Lincoln Trust Company, Resources Trust Company, and

Retirements Accounts Inc., united as Fiserv Trust Company under FiservISS.  Ms. Park made

Trades under Advisor Services (Datalynx) and IRPS (Trustlynx) units under the FiservISS

umbrella as well as other entities within the Fiserv unit.  FiservISS principal place of business

was 717 17th Street, St 2100 Denver CO 80202 and merged under its trade name is FiservISS's

and true name is Fiserv Trust Company per "Colorado Statement of Trade Name" filed 9/19/06

and FiservISS and Fiserv Trust Company merged on or about 8/18/08 with TD Ameritrade Trust

Company, a Maine Corporation with principal address as 6940 Columbia Gateway Dr., St 200

Columbia, MD 21046.  Ms. Park made Trades and provided back office support from 2/4/08 to

8/18/08 for Defendant's FiservISS and FTC, in part due to the Conversion of Assets.  **See**

**Exhibit 1 & 2** Fiserv later entered into a separate transaction with Robert Beriault to purchase

TIB and run under the auspices of Lincoln Trust Company that may have been finalized per

Articles of Incorporation on or about 11/19/09.

9.      Defendants's Fiserv, Inc. is and/or was the controlling owner of the subsidiary

Page 4   Civil Action No. 10-cv-00189-PAB-CBS

companies which were supposed to serve as custodians at all relevant times and had

responsibility for all of its subsidiaries acts and omissions.  This Amended Complaint involves

Defendant's staff Jeffrey Yabuki ("Yabuki"), Fiserv et al Board of Directors, Beriault,

Defendant's, as well as other staff within Defendant's list of employees who worked under

various entity and subsidiary names who have interacted with Ms. Park with regard to these

allegations and of which she holds liable.

      10.     Discovery will establish the Defendant's failed to exercise due care and diligence.

Jeffery Yabuki ("Yabuki"), Beriault, Fiserv, Inc. Board of Director's, and HR Director, Susan

Zimmerman ("Zimmerman") through Defendant's companies, failed to prevent discrimination

and upon knowledge, failed to rectify the misconduct perpetrated against Ms. Park with relation

to these allegations in this Amended Complaint.  Since Fiserv Inc. is the parent company and

controlling owner of the subsidiaries/units, and of Fiserv ISS, at all relevant times, Fiserv, Inc. is

also responsible for its subsidiaries acts and omissions through deceit, negligence, aiding and

abetting, intentional misconduct, conspiracy, and fraud under the "Doctrine of Respondeat

Superior."  Delay, deny Plaintiff's allegations as fact, and dispute as trivial will be the *thrust* of

Defendant's scope of litigation when honesty and a Code of Business Ethics demands otherwise

for this momentous Civil Action.  **Exhibit 2A**

      11.     On 2/4/08, TD Ameritrade Online Holding Corp ("TD Online") is and was, at all

relevant times, a corporation organized under the laws of the State of Delaware and purchased all

outstanding stock of FTC and it's assets with the exception of the custodial accounts of Madoff

Securities for $225 million.  TD Ameritrade Holding Corporation ("TD Holding") is and was, at

all times relevant, a corporation under the laws of the State of Delaware.  TD Holding is the sole

Page 5   Civil Action No. 10-cv-00189-PAB-CBS

owner of TD Online and is responsible for it's liabilities.  Ms. Park traded and provided back

office support (for a portion of the $225 million in assets) for both companies under subsidiary

TD Ameritrade Trust Company, Inc. ("TDATC") after 2/4/08 and experienced and witnessed

third party discrimination, etc. by Defendant's from 3/17/08 onward as a TDATC employee.

## JURISDICTION & VENUE

5.      Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§§§ 1331, 1332 et seq.,

1343, and 1367.  This action is brought, *inter alia*, and authorized under and instituted pursuant

to §706 of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, et seq, 42 U.S.C. §

2000e et seq., as amended, 42 U.S.C. § 2000e-2 et seq., and 42 U.S.C. §§§§ 1981, as amended,

1981a (Section 1977a et seq.), 1983 et seq., 1985, and 1988, 42 U.S.C. § Section 1986 of

Defendant's continual knowledge of wrongs conspired, 42 U.S.C. Section 2000(e)(3)(a), 42

U.S.C. Section 2000(e)(10)(a)(b) (failure to post State and Federal notices of Discrimination and

Retaliation policy posters on floor 28 of Defendant's workplace in Denver, CO), Colorado

employment authorized under and instituted pursuant to : Colorado Revised Statutes, 2002 ("the

Colorado Anti-Discrimination Act").  C.R.S. Sections 24-34-401 et seq., C.R.S. Section 24-34-

402, *et seq.*, Civil Rights Act of 1991, as amended, et seq., American's with Disabilities Act

("ADA") of 1990, as amended, 42 U.S.C. §§ 12111(5)(a), 12112 et seq., 42 U.S.C. § 12101.

This Court has personal jurisdiction over Defendant's pursuant to § 13-1-124 C.R.S (2003) since

Defendant's transacts business and/or maintains offices in the State of Colorado and measure up

to the "fair play standard" and substantial justice as all Defendant's have conducted activities

within the forum and entered into contracts formed and Trading activities performed within the

State of Colorado prior and/or during Ms. Park's tenure as an employee.

Page 6   Civil Action No. 10-cv-00189-PAB-CBS

It should be noted Ms. Park is working with the U.S. Attorney's Office pursuant to 42 U.S.C. §

Section 1985(1)(2)(3) which is to determine if "witness tampering" or "conspiring to commit

obstruction of justice" in pending allegations in whole and/or part have been committed by 1 or

more of the 5 Defendant's listed in Civil Action No. 10-cv-00188-PAB-BNB  based on material

Facts with regards to Plaintiff's Civil Action against them.  Upon information and belief, these

illegal acts may have also occurred to further influence the verdict, sway the public, or the jury

due to direct evidence with Defendant's Civil Action No. 10-cv-00189-PAB-CBS, and of which

1 or more of the 7 Defendant's may have knowledge of such illegal dealings.

6.      The alleged unlawful employment took place at 717 17th, Street, Denver, CO

80202 and at crosswalk one block north and near "Old Chicago," downtown Denver, CO 80202.

7.      Venue is proper with this Court as female Plaintiff is a resident of Colorado and

alleged violations occurred as she worked in Colorado for Defendant's pursuant to

28 U.S.C. § 1391 et seq., and 28 U.S.C. § 1332 et seq., as Defendant's President and CEO,

Jeffery Yabuki normally works and resides in the state of Wisconsin.

### ADMINISTRATIVE PROCEDURES

8.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity

Commission on 09/15/08 regarding some details of alleged discriminatory conduct by

Defendant's and she received a Notice to Sue from the E.E.O.C. on 11/3/09.  **Exhibit 3**

### NATURE OF THE CASE

9.      Normally, the Court reads a Complaint liberally and "'accepts as true the well

pleaded allegations of the Complaint and the inferences that may be reasonably drawn from

those allegations.'" Panaras v. Liquid Carbonic Indust. Corp., 74 F.3d 786, 791 (7th Cir. 1996)

Page 7   Civil Action No. 10-cv-00189-PAB-CBS

10.     This prima facie case, *inter alia*, is based on abhorrent employment, retaliation, discrimination, vicarious supervisory acts, promissory estoppel, intentional infliction of emotional distress, breach of contract, gross negligence, fraud, ethnic harassment, racial discrimination, perverse sexual harassment, bystander gender-identity (gay) bashing, bystander gender-identity harassment, national origin harassment, hostile work environment, third party harassment, third party hostile work environment, third party implied threats, and third party discrimination and retaliation for reporting, third party negligence which adversely affected Ms. Park's status as employee.

Plaintiff has digital tapes, sexist emails enclosed are "samples" of direct evidence of violations of Defendant' Human Resources policies and Title VII laws, depositions will prove circumstantial evidence of a prima facie case of retaliation, and parties subpoenaed will include:  President Barack Obama, Vice President Joe Biden, Jr., Oprah Winfrey, former President Bill Clinton, etc. Plaintiff asked the EEOC, Denver U.S. Attorney's Office, U.S. Attorney's Office, and Danette May ("May") for the email "Twenty Reasons Why I Hate Blondes" sent by May as the retaliatory email exists and perjury has been committed by Defendant's for denying as such.

## SUPPORTING FACTUAL ALLEGATIONS

11.     See www.teapartydenver.com to further illustrate Ms. Park opposing and bringing awareness of many acts of gross misconduct, egregious discrimination, retaliation, intimidation, sexual harassment, racial and ethnic discrimination, ADA Caregiver harassment, implied and actual threats, constant and work trauma, etc. of Defendant's listed in Civil Action No. 10-cv-00189-PAB-CBS and Civil Action No. 10-cv-00188-PAB-BNB which includes Defendant's TD Ameritrade Trust Company, Inc., The Toronto-Dominion Bank,

Page 8   Civil Action No. 10-cv-00189-PAB-CBS

TD Ameritrade Online Holdings Corp., TD Ameritrade Holding Corporation, International

Clearing Trust Company, Joseph H. Moglia, and J. Thomas Bradley, Jr., which will be

collectively known as "TD Ameritrade et al" throughout this Amended Complaint.  Both Civil

Actions are directly related from an employment standpoint.

12.     Plaintiff Lori L. Park ("Park" or "Plaintiff") acting as Pro Se Plaintiff,

complaining of Defendant's FISERV TRUST COMPANY, FISERVISS, FISERV INC.,

LINCOLN TRUST COMPANY, TRUST INDUSTRIAL BANK, INC., and ROBERT

BERIAULT HOLDINGS, INC. collectively known as the ("Defendant's")  Plaintiff sues

all Defendant's, and/or as legal successors, by merger or otherwise, and or controlling persons

and as Third Party Vendors, Ms. Park alleges as follows:

Ms. Park was interviewed by Danette May ("May"), Supervisor and Matt Johnson ("Johnson"),

Team Lead and began employment with Defendant's on April 2, 2007 as a Mutual Fund Trader

to work the Rejected Trading Desk starting at 5:40 AM alongside Mike Foster ("Foster"), Team

Lead.

13.     After Defendant's Human Resource staff discussed the vast finances of John

Albert Elway, Jr. and the division of assets between *esteemed* Elway and Janet Buchan Elway

during their bitter divorce in 2003 during Defendant's new employee 3-4 week training program,

Plaintiff realized Defendant's were a Fortune 500 company and major players in financial

markets.  Defendant's staff stated they lost their largest TPA Client after 3/8/08 and business was

risky (lose more TPA business) due to Defendant's trading/losses with Bernard Madoff Scandal.

Page 9   Civil Action No. 10-cv-00189-PAB-CBS

Soon after Ms. Park completed Defendant's financial and company orientation, she began

training with Laura Montoya ("Montoya") May of 2007 to learn Trading functions when

Montoya advised Plaintiff the first week of training to "not trust Danette" upon information and

belief that there was a "triangle relationship" between Jaime Olano ("Olano") (unsure of spelling

of Jaime's full name but will hereafter be referred to as "Olano") and May who were

against Montoya in part because Olano and May partied together.  May supervised Olano and

Montoya.  Montoya complained to Ms. Park that May "sat around all day" at Defendant's

workplace and "surfed/instant messaged friends."

14.     In addition, the first week, Montoya raged to Ms. Park several times that Johnson

was "too lazy to train people and Ms. Park."  Montoya labeled Jerry Naylor ("Naylor") as the

"skinny runt who rides his bike so much he has no meat on his bones.  You can tell he is gayer

than gay."  Montoya informed Plaintiff Frank Abate ("Abate") was openly gay and Montoya

degraded and mocked him to Ms. Park by pursing her lips together and made "little bitty baby

claps" to mimic Abate's "gay" mannerism's.  Ms. Park did not illicit this information and

was repulsed, refusing to be drawn into Montoya bashing Trading teammates.

15.     May 2007, Olano transferred to a different department because of a "blow-up"

between May and Olano while partying per Montoya.  May also fired a female Trader April

Page 10   Civil Action No. 10-cv-00189-PAB-CBS

2007 for not performing her job duties per Johnson.

16.     Summer 2007, Montoya degraded Lavesh Daswani ("Daswani") to Plaintiff several times stating he was "too lazy" to complete his Trading work and "letting his Trading work go downhill." Montoya berated Foster to Plaintiff with "all the "god-damn dumb son-of-a-bitch" wants to do is complain. She often referred to Foster as the "son-of-a-bitch," or "god-damn son-of-bitch" to Ms. Park.

17.     Ms. Park was overwhelmed at the nature of inappropriate statements made by Montoya as they were not solicited by Plaintiff as everyone should be "welcome in the workplace" and these staff were people she took leadership from and who would be instrumental in her Trading success for the Defendant's. Plaintiff advised Montoya to address any issues she was having with Trading staff to May's supervisor, Lisa Carpenter ("Carpenter") and Montoya replied, "what good would it do."

18.     June 2007, Johnson informed Plaintiff her strong work ethic was a "breath of fresh air to the team." Montoya degraded Plaintiff from the start of employment to 8/31/07 over 20 times by stating to Plaintiff repetitively, "you don't know what you are doing," "you are so stupid," "you are going to mess up those trades you are keying in" while Plaintiff performed daily Trading functions which undermined Plaintiff's confidence. May stated during this course of time in email and in person that Plaintiff was "doing a great job" for Defendant's.

Page 11   Civil Action No. 10-cv-00189-PAB-CBS

19.     Montoya stated to Plaintiff that Andrew, her live-in boyfriend was not good to her and was abusive or mean-spirited in some way (unsure if it was sexual, physical, verbal, emotional, or psychological abuse) per innuendo's she made to Plaintiff and/or other teammates. Ms. Park did not want to be "up in Montoya's relationship" as Montoya carried her bitterness from home to the workplace thus bashing, degrading, and denigrating men of whom Ms. Park took supervision.  Montoya discussed unsolicited sexual intercourse details with Ms. Park regarding Andrew and her ex from New Mexico.  Montoya broke up with Andrew, dated staffer Brandano, then resumed relations with Andrew, of which she now may be married to. Plaintiff advised Montoya to do what was best for her own well-being and informed May on 7/9/07 that Montoya was speaking negatively about team members.  May didn't ask for specifics but advised Plaintiff not to go to lunch or spend time with Montoya and May confirmed Montoya had been ridiculing Plaintiff to her and/or teammates.

20.     From June 2007 onward, Foster and Plaintiff liaisoned price protection between numerous small and large Trades for over 150 Fund Companies, Transfer Agents, and Defendant's on an often *harried* daily basis because the window of price protection started at 5:30 AM and concluded about 10 AM.  Each fund had its own deadline for price protection every morning.

New accounts were particularly time consuming for one omnibus trade.  One Rejected Trade could be upwards of $140 million dollars and we worked numerous other detailed Trades each day.  Error or failure to price protect could cost the Defendant's hundreds if not over $100,000.00 for one Trade depending on the size of the Trade if Plaintiff or Foster were not meticulous to attend to Trade details which could result in a gain or loss on each trade.

Page 12   Civil Action No. 10-cv-00189-PAB-CBS

21.     On 7/12/07, Abate emailed Plaintiff he wanted most if not all Rejected Trade

information by 9 AM from Plaintiff that she had worked and also compiled from Foster so Abate

could process his Trading work timely.

22.     Summer 2007, Sarla Banda ("Banda"), who is Indian, *rejoined* the Trading Team

and Montoya began training her in a supervisory capacity with the various Trading functions.

Shortly after a morning of training, Montoya came to Plaintiff's cube between 9-10:30 AM on a

Thursday and maliciously and racistly stated, "I don't like working with Sarla because you can't

understand her." Montoya's disapproval of Banda's *strong* Indian National Origin dialect meant

Banda was not welcome in Defendant's workplace.

23.     The constant ridicule of Plaintiff, staff, racial and national origin discrimination

from Montoya became overwhelming to take. On or about 8/17/07, Montoya informed Ms. Park

that the Hispanic race (of which Montoya is a member of) had always been discriminated against

by the White (Caucasian) Race. Montoya had been using Defendant's internet to read such

offending statements of racial bias towards Caucasian's on a blog. Ms. Park was offended at the

extreme racism, hatred, and intimidation Montoya demonstrated as Ms. Park is a member of the

Caucasian race.

24.     On 8/30/07, Montoya belligerently stated to Plaintiff she was "shoving her mouth

full of food." Plaintiff e-mailed Montoya to not talk to her unless it was work related *which*

*gives rise to Montoya talking inappropriately at work*. Ms. Park emailed Johnson and May

8/31/07 at 12:49 PM requesting to meet about Montoya's discrimination, unprofessionalism, and

beleaguering statements towards teammates and Ms. Park. **Exhibit 4**

25.     On 8/31/07 at 1:20 PM, Plaintiff met Johnson in the Vail Room. Plaintiff

Page 13    Civil Action No. 10-cv-00189-PAB-CBS

reported to him that Montoya was bashing and ridiculing Plaintiff's teammates with regard to the

following:  Abate was gay because the way he clapped his hands together; Daswani was not

doing his QC/Reconciliation work; May surfed the internet and instant messaged friends a lot

while at work; Johnson was too lazy to train people; Montoya divulged to Plaintiff Johnson was

searching/interviewing for a different job outside the company; Montoya cussed about Foster

because all he did was complain about work all the time; Montoya stated "she didn't like working

with Sarla because of you can't understand her."  Plaintiff pointed out to Johnson that Montoya

was degrading and mocking Plaintiff's teammates and Ms. Park and Plaintiff wanted this type of

negativity and harassment to stop.  Johnson advised Plaintiff that May and he would meet when

May returned to work.  Johnson did not take notes of Plaintiff's statements.  **Exhibit 5**

26.    On 9/4/07 at 10:30 AM, per Ms. Park's email request to meet, (in the Keystone

Room), Plaintiff reported to Johnson and May that Montoya was "mocking Frank for being gay

because the way he clapped his hands together."  Montoya stated Daswani wasn't doing his

Dividend Recon/QC work.  Plaintiff noticed Dawani was discouraged because he might be out

of a job if Defendant's sold the company.  Montoya used fowl language about Foster to Ms. Park

repetitively and said that "all Mike ever did was complain about work."  Montoya said Johnson

was "too lazy to train people and Lori."  Montoya stated May surfed the internet constantly,

instant messaged friends a lot while at work, and for Plaintiff to not trust May because of her

relationship with Olano.  Plaintiff stated Montoya was continually putting Plaintiff down and

making Plaintiff feel inferior because Montoya stated Plaintiff didn't know how to do her job.

Mid-way through the meeting, Plaintiff established a prima-facie case by engaging in

protected EEOC activity by reporting National Origin Mocking based on Indian Dialect to May

Page 14   Civil Action No. 10-cv-00189-PAB-CBS

and Johnson. Plaintiff stated, Montoya told me she "didn't like working with Sarla because you

can't understand her." Plaintiff stated to both supervisors, "if I can't understand a comment or

question that Sarla has said, then I politely ask her to repeat what she has said. I have to work

alongside Sarla and the other teammates mentioned and don't want to hear anymore of Laura's

comments towards them."

May closed the meeting with "what would you like us to do?" Plaintiff replied, "I want you to

address these concerns with Laura because I don't want to be a part of these conversations."

May stated they would talk to Montoya about these issues. Neither Johnson nor May took notes

during the 20 minute conversation. **Exhibit 6**

27.    This information of opposing National Origin mocking based on Dialect and other

issues discussed in the 9/4/07 meeting were <u>also</u> outlined in email attachment 5/13/08 sent to TD

Ameritrade et al staff Jan Podboy, HR ("Podboy"), Lisa Carpenter ("Carpenter"), May's

Supervisor, and Robert Norcross ("Norcross"), Podboy's HR Supervisor. **See Exhibit 7**

28.    May failed to research the issues of National Origin Discrimination further that

Ms. Park turned over to Johnson and she 9/4/07. May failed to involve HR to make

sure Defendant's company policies were followed based on Plaintiff's statements 9/4/07.

How was Montoya admonished? Plaintiff reported unlawful actions and May and Johnson

either didn't respond at all or decided to address only a few issues. There were no EEOC

posters posted on Floor 28 for Ms. Park to be guided by.

1606.8 Harassment. (d) With respect to conduct between fellow employees, an employer is
responsible for acts of harassment in the workplace on the basis of national origin, where the
employer, its agents or supervisory employees, knows or should have known of the conduct,
unless the employer can show that it took immediate and appropriate corrective action.

29.    On or about 9/7/07, May launched a conspiratorial and full-fledged attack on Ms.

Page 15   Civil Action No. 10-cv-00189-PAB-CBS

Park as she witnessed Foster reading a sexist, gender-based, denigrating email at his cubicle

sent by May to Foster, Daswani, Montoya, and/or others titled "Twenty Reasons Why I Hate

Blondes." (There were a list of sentences Ms. Park witnessed as she stood over Foster's shoulder

while he read the email). Ms. Park was aghast as she was the only blonde on the Trading Team

and May was her supervisor.

May intentionally and maliciously instigated gender-based sexual harassment and retaliation for

reporting National Origin mocking based on Indian dialect and other infractions after Ms. Park

engaged in protected EEOC activity 7/31/07 and 9/4/07 by reported Montoya for racistly

ridiculing Banda's National Origin *strong* dialect and other Personnel infractions.

    30.    May set in motion a perpetually destructive hostile work environment that would

"*rage on*" up to December 2009 while Plaintiff was a TD Ameritrade et al employee.

    31.    This email denigrated and demeaned Plaintiff on the basis of her sex to her

teammates of whom Plaintiff took daily supervision from and closed the door to Ms. Park

reporting infractions to May because May's conduct was that offensive to Plaintiff. The law

states "Dumb Blonde Jokes" are considered Gender-Based Harassment per Spaulding v. West,

1998 WL 745717 (E.E.O.C. 1998) and Dernovich v. City of Great Falls, MHRCNo. 9401006004

(Nov. 28, 1995). It does not involve explicit sexual behavior. It may include epithets, slurs, and

negative stereotyping of men or women, directed at a female or male employee. It could include

denigrating or hostile written material about the employee posted or circulated in the workplace.

"Dumb blonde" or male-bashing jokes could be examples of gender-based harassment. Gender-

based harassment is similar to racial harassment, according to state guidelines, because when it is

severe and/or pervasive enough to create an abusive working environment, it violates the law."

Page 16   Civil Action No. 10-cv-00189-PAB-CBS

32.     May's retaliation was severe and pervasive enough to create an ongoing abusive working environment for Ms. Park. The <u>highly suspicious timing</u> (casual connection) of this adverse act directly relates to willful, malicious, evil motive, and negative intent to discriminate against Ms. Park based on her sex for following the law by opposing and reporting a hostile and discriminatory work environment and to destroy trust with teammates. Ms. Park was no longer welcome at Defendant's workplace. The sexist email existed until Ms. Park filed EEOC Charges 9/15/08 and then the lawyers put the "*hocus pocus*" on the email in "attempt" to end culpability.

33.     "Sexually stereotyping" blonde females as "dumb blondes" meant Ms. Park was no longer welcome at based on her sex. Ms. Park provided financial support to her parents as her father had been badly burned prior to Ms. Park's employment with Defendant's so this job was critical to Ms. Park and her family.

May's chilling actions set the tone, content, and pattern for supervisors and teammates to ridicule and insult based on sex Ms. Park via unlawful and vile emails weekly which content contained sexually-hostile, obnoxious, perverse, orgasm, ethnic, and pornographic content.

Late fall 2007, Naylor was surfing the net at Defendant's workplace when he told Ms. Park that Alex Rodriguez ("A-Rod"), who is professional baseball player for the New York Yankees currently, bought a $5 million dollar pad so he and his "Stripper" could kick it and have "unlimited sex" even though he was still married to Cynthia Rodriguez. Naylor inferred that with $150 million dollar contract being negotiated, A-Rod could afford and probably had "lots of strippers." (The internet article Jerry was reading may lay claim to who the Stripper was). Naylor regularly referred to Abate with sexual term "Spank" to Ms. Park and Abate.

34.     Furthermore, May's behavior was so objectively offensive it altered the conditions

Page 17   Civil Action No. 10-cv-00189-PAB-CBS

and privileges of the victim, Ms. Park's employment and set the tone for <u>countless</u> future Title

VII incidents and <u>ultimately</u> dismissals of Foster, Daswani, and others and executed lay-offs of

May, Montoya, Teed, Banda, and many others tied to the incidents to these incidents at

Defendant's workplace and the five Defendant's, TD Ameritrade et al with relation to Civil

Action No. 10-cv-00188-PAB-BNB.

35.     Summer 2007, Ms. Park refused to be baited by Daswani's disturbing sexual

advancement that he could not see her breast's very well because she "always had them covered

up." He in turn emailed obscene orgasm, ethnic, and sexually-charged emails to Ms. Park after

9/4/07 as staff had been given the "green light" to debase and humiliate Ms. Park on the basis of

her sex and race. <u>Small</u> sampling of Defendant's staff emails include **Exhibit's 8, 9, 10, 11**

36.     July 2007 and thereafter, Johnson informed Ms. Park that Foster was "not saved"

and would "go to hell" if he didn't accept Christ. Johnson stated Foster had a brother who died

tragically and Foster probably wouldn't get saved because he was mad at God because of his

brother's violent death. Supervisor Johnson's religion proved false to Ms. Park because of his

ungodly actions and perverse emails sent while at work such "Dumb Blonde Jokes" and gender-

identity bashing jokes. Johnson supervised Ron Teed ("Teed") who was gay and also made

disparaging remarks about Teed being gay and would not be a good Trader because he wasn't

doing his job very well to Plaintiff.

37.     Defendant's supervisor's May, Foster, and Johnson condoned the Title VII

violations as they emailed and allowed their names to be on the sexual harassment, hostile,

ethnic and racial harassment, religious harassment emails sent at Defendant's workplace from

summer 2007 to March 21, 2008 by Defendant's staff. **Exhibit 12**

Page 18   Civil Action No. 10-cv-00189-PAB-CBS

The victim, Ms. Park, defined the gender-based sexual harassment and sexually-hostile work environment as unwelcome. Submission to such conduct was made explicitly and implicitly as a term and condition of Ms. Park's employment by the <u>constant</u> flow of illegal emails sent. Supervisors continually failed to prevent the hostile and discriminatory acts.

38.   <u>Pretext to put the "*hocus pocus*" on the sexist email</u>. To impeach Defendant's stand that the email "Twenty Reasons Why I Hate Blondes" was not emailed at Defendant's workplace in Denver, CO by May, credible <u>direct</u> evidence exists May sent the email "Twenty Reasons Why I Hate Blondes." Plaintiff witnessed Foster reading this email around 6 AM, days after 9/4/07. Furthermore, we can rely upon Counsel for TD Ameritrade et al, Mark C. Willis, Kutak Rock LLP who noted in his Response to the EEOC that May was "documented for misuse of computer and sending inappropriate emails" which is in part what Montoya stated to Plaintiff May 2007 about May "instant messaging friends and surfing the net" which gives rise to the fact she was sending illegal emails to her own Trading staff but not to Ms. Park. **Exhibit 13**

39.   Tai Cheng (Cheng), TD Ameritrade et al HR, stated on 7/7/08 in a phone call with Ms. Park that May sent the email "Twenty Reasons Why I Hate Blondes" and "she absolutely has done something wrong" in emailing it to teammates. "TD has taken a very aggressive approach to disciplinary action for Danette." Cheng failed to call Ms. Park every 2 weeks as he promised. (This call may be on a recorded line). **Exhibit 14**

40.   Podboy and Norcross admitted May through July 2008 in conferences that the email existed that Danette sent September 2007 and May was "severely admonished for sending the email" by Podboy, Norcross, and Carpenter per Podboy.

Norcross admitted 7/2/08 in teleconference that may be on a recorded line that the email "Twenty Reasons Why I Hate Blondes" was sent but not tied directly with the problems Ms.

Page 19   Civil Action No. 10-cv-00189-PAB-CBS

Park was having with Montoya on 8/30/07 which is a lie because Ms. Park reporting Montoya

on 9/4/07 was the "motivating factor" in May sending the gender-based, sexist email on or about

9/7/07 to Montoya, Foster, Daswani. May had great difficulty with female work relationships

with Olano, Montoya, Heather Low ("Low") (May said she got rid of Low once), and Ms. Park.

41.     Adverse Treatment and Supervisory Retaliation became a <u>daily</u> condition of

employment for Ms. Park to rigorously endure.  Supervisors May and Johnson failed to take

remedial action against Montoya and this set a malicious, adverse, and hostile work environment

where Foster, Plaintiff's primary trainer lodged daily if not several time per week *retaliatory*

planned acts against Plaintiff with relation to Ms. Park concluding her Rejected Trade's timely.

Foster undermined Ms. Park daily if not several times per week so she could not perform her job

duties effectively and efficiently as <u>he would instead assist Montoya and other Trading team</u>

<u>members</u> with trading work that did not have price protection deadlines.

Several times, Foster rebuked Ms. Park and rudely told her to "figure out the Trades yourself"

while Ms. Park was working with several million up to $140 million dollar plus trades.   Foster

and Johnson refused to train Ms. Park on every facet of Trading on new accounts so she was

forced to be reliant on the both of them and May had closed the door to Ms. Park freely seeking

her advice on Trades after 9/4/07.

Fund Companies could not meet their deadlines and Plaintiff in turn had to delay Trade

processing with Abate practically every day.  May overheard Plaintiff's repeated pleas for

assistance and Foster continued to rebuff her request for Foster's trade details and assistance with

critical Trade questions and time sensitive deadlines.  At one point, May emailed Foster and

Plaintiff to stop all overtime.

Page 20   Civil Action No. 10-cv-00189-PAB-CBS

42.      On 9/5/07 and every day onward, Plaintiff witnessed May acknowledge all

Traders when she arrived to work but refused to acknowledge Ms. Park.  Skip Schweiss

("Schweiss"), Vice President stated in a company meeting prior to 10/4/07 to pass along

information as we heard it to our teammates.  May reprimanded Plaintiff one month after 9/4/07

in email to all staff for "gossiping" because a Manager told her team that we might receive

bonuses to stay on with the company if it sold.  Ron Teed ("Teed") stated May was

extremely harsh with Plaintiff for "no good reason."  Plaintiff became even more reclusive.

43.      Daswani was motivated to wound Ms. Park when he stated numerous times to

Plaintiff on or about 9/7/07 to on or about 3/07/08 he "heard Plaintiff was slow in processing

Rejects" which further destroyed Ms. Park's credibility with the Trading Team.  Ms. Park

informed him Foster purposely delayed when Plaintiff could process Rejected Trades.

44.      Approximately two weeks after 9/4/07, Plaintiff advised Johnson that Foster

was withholding Rejected Trades he had worked since reporting Montoya 9/4/07.  Johnson stated

he would discuss this with Foster but Foster's retaliatory actions continued numerous times per

week from 9/4/07 up to May 2008.  Ms. Park continually informed and/or emailed Abate that

Foster did not have his Trades to Ms. Park to complete processing or Ms. Park didn't have her

Trades completed because Foster was doing other staff's work instead of assisting Ms. Park with

critical deadlines.

45.      Throughout the fall of 2007 to May 2008, Ms. Park refused to go directly to May

for Trading questions after Ms. Park witnessed the sexist email.  Ms. Park would instead go to

Foster and Johnson for Trading advice and neither would acknowledge Plaintiff's presence when

standing at their cubes.  Foster would instead assist other Trader's or make Ms. Park wait for

Page 21   Civil Action No. 10-cv-00189-PAB-CBS

four to five minutes in order to humiliate Ms. Park which severely impeded the amount of work

and lessened the complexity of work Plaintiff performed after reporting Montoya 9/4/07.

The more forgiving Ms. Park, was the more hate-centered they became.  This barbaric treatment

of Ms. Park resulted in her stuttering, interrupting conversations at work, and she experienced

extreme anxiety and panic attacks after reporting Montoya.   Both team leads purposely chose to

undermine Ms. Park's ability to do her job by intimidating her for reporting Montoya.

46.    On or about 10/1/07, supervisor Johnson sent the Trading Team egregious email

with subject line "this is cool" of a jet taking off and "purposely crashing into a big block

building" which echoed 9/11/01.  May became the "lesser of two evils" that day versus Johnson

due to the nature of the *sadistic* and *unpatriotic* email sent by Johnson which echoed 9-11 and

was sent around the time of 9-11-07.  The video depicted a plane imploding into the big block

style building, engulfing it in flames, which left Ms. Park horrified at the image of the video and

Johnson's lack of intelligence for thinking "this was cool" as Ms. Park is *petrified* of fire.

47.    Johnson was informed May 2007 that Plaintiff's father had been badly burned in a

propane explosion, on fire from the waist up as well as his entire face.  He spent months in

Wichita ICU Burn Center and endured several skin grafting surgeries and countless hours of

intense therapy to learn to walk, talk, and regain physical strength prior to Ms. Park's

employment with Defendant's.  He is presently disabled due to lifelong complications from the

burns and has severe nerve damage to his hands and body.   This job provided income to assist

Ms. Park's parents or Ms. Park would have resigned immediately due to the *toxic* workplace.

48.    On or about mid-November 2007, Montoya stated to Foster, "I can't take it much

more with Lori." Foster responded, "it won't be much longer." Then TD Ameritrade et al

Page 22   Civil Action No. 10-cv-00189-PAB-CBS

announced which Traders would receive positions. Montoya and Foster were devastated Foster and Johnson were not hired by TD Ameritrade.  Plaintiff was astonished she was the candidate they selected and only interviewed for "interview experience" as Foster had the job "sewed up" based on his superior Trading skills and knowledge.  Foster had 7 years experience to Plaintiff's 6 months direct experience but they hired Plaintiff strangely enough.  Johnson was deeply offended TD Ameritrade et al did not hire him.  Plaintiff thanked May because she thought May gave an honest evaluation of what Ms. Park would bring to TD Ameritrade et al even though May didn't like Plaintiff as Ms. Park was dedicated to try to be an "Exceptional Employee" even in the face of adversity.  Danette snidely replied, "TD made the choices. I didn't have any say in who would be on the team."

49.    On 12/28/07, Johnson reprimanded Plaintiff to "work Rejects faster." Ms. Park stated Foster was busy working with Montoya and holding onto his Rejected Trade information" so Ms. Park couldn't get the Trade information to Abate by 9 AM.  Plaintiff hit Naylor as she left work, devastated and crying inconsolably.  She continued to endure severe anxiety and panic attacks and became extremely reclusive with mostly exception of Abate and Naylor.

50.    On 1/10/08 and throughout the winter 2008, Banda stated to Plaintiff, "Lori bothers me." Plaintiff said hello to Banda about every day and didn't talk to her much otherwise. Montoya had poisoned her.  Banda continually harassed Ms. Park about what time she arrived for work and would interrupt Ms. Park while she was making phone Trades.

Thus, a new systematic campaign from Foster, Johnson, Banda, Daswani, Montoya, and May resulted in these staff harassing Ms. Park about what time she arrived to work which was 5:10 AM.  May advised Ms. Park in her February 2008 evaluation that May was upset Ms. Park

Page 23   Civil Action No. 10-cv-00189-PAB-CBS

was coming in so early to work and she needed to revise her work schedule. Ms. Park counter-responded that price protection cut off started at 5:30 AM for Defendant's and Plaintiff would not have even turned on the computer if she came in at 6 AM which would have ultimately resulted in Ms. Park's dismissal due to trade losses. The 5:10 AM start time had been prior approved by Johnson and May the summer of 2007.

51.     Spring 2008, Plaintiff witnessed Daswani discuss with May that he went to a "Strip Club" for lunch with other Defendant's employees. Daswani also came to work inebriated several times per May's knowledge.

52.     Plaintiff continued to receive a rampant list of sexist, ethnic harassment, hostile, and religious emails from Daswani, Johnson, and sometimes Montoya the spring of 2008. May further destroyed Ms. Park's trust to report these infractions to her as May violated Defendant's policy to have a retaliatory and sexual harassment free work environment by receiving those very emails herself and not rebuking her Trading staff and Team Leads for perpetually sending such "vile sexual and demeaning filth" at Defendant's workplace. The misconduct was deplorable.

53.     January 2008, Daswani asked Plaintiff if it were true that eating blue and/or green M & M's would make him any "*hornier.*" Ms. Park rebuffed his sexual banter with she didn't know.

54.     Montoya revealed to Plaintiff her salary was "around $34,000" even though the Defendant's contractual agreement for the "Retention Bonus Payout" Montoya signed stated she would not discuss her salary with any staff or she could lose the bonus or perhaps have to pay it back to Defendant's if this information were revealed. Plaintiff did not solicit the information from Montoya. Montoya received a bonus of approximately $9,800.00 or more before taxes.

Page 24   Civil Action No. 10-cv-00189-PAB-CBS

55.     On 2/14/08, Foster maliciously informed Plaintiff to send erroneous e-mails with his wording Front Office staff.  This act of hostility occurred 2-3 other times between 02/2008 to 03/2008 and engaged Ms. Park to further look foolish to staff.  **Exhibit 15**

56.     On or about 02/2008 to end of 03/2008, Supervisor May imposed greater demand on Plaintiff than every Trader on team and materially adverse-changed Ms. Park's duties: May assigned Plaintiff 2 full time positions 02/2008 as well as Plaintiff's own Trading position while Montoya and Banda were on leave of absence.  Plaintiff was asked to perform 3 full-time jobs in 37.5 hours per week while all other Trader's performed their 1 regular job function.  After two weeks, Plaintiff was not able to maintain the workload of all 3 jobs.  Plaintiff advised Johnson who then asked Daswani to QC Trades but he refused to perform 2 ½ weeks worth of Trading work because he was despondent he wasn't selected on the TD Ameritrade et al Trading Team.

Plaintiff informed Johnson that Daswani's QC work was not completed which further impacted Plaintiff's stress and workload.  Johnson advised Plaintiff to wait for May's return.   Plaintiff stated to May  the QC work was not completed because Daswani gave the work back to Plaintiff 1-2 days before her return because Daswani "didn't feel like doing it."   She bellared at Plaintiff, "why didn't anyone tell me about this."  Lavesh was not documented for performance issues because May and he had partied together.  Plaintiff was still reassigned the QC work along with Yvette, Defendant's employee.  A handful of Trades had not been placed and Ms. Park had to work with the Fund companies to place the Trade(s).

57.     On or about 03/11/08, Daswani stated to Plaintiff he did "weed" (marijuana). During that conversation, Daswani again degraded Plaintiff with her work performance as he

Page 25   Civil Action No. 10-cv-00189-PAB-CBS

heard she was "slow at processing Rejected Trades." Ms. Park emphatically informed him

it was Foster who held on to his Trade details and helped Montoya and others so Ms. Park could

not complete her Trading timely.

Plaintiff mentioned she would be having surgery and Daswani again remarked, "I can't see your

breast's because you always keep 'em covered up." Plaintiff changed the subject to "Wires

needing to be Sent to the Fund." Lavesh became extremely hostile with Plaintiff and yelled at

Plaintiff "I don't need you telling me what to do" and through a stapler against the wall as

Plaintiff was standing by his side. Daswani was a Senior Trader and livid he was not selected to

be on the new TD Ameritrade et al Trading Team effective March 2008.

58.     It cannot be discounted that supervisor's Johnson, Foster, and May's Trading

knowledge is far superior to many a candidate and yet it was their perverse, wicked, and evil

conduct that intersected a positive Trading experience and parlayed it into a continual hostile,

discriminatory, retaliatory, destructive, and defeating work experience for Ms. Park. The trio's

immense Trading talent was daily and weekly overshadowed by malice and indifference to the

federally protected rights of Ms. Park and it became a depressing chore to be a Christian and rise

above the intense hatred and to "forgive and forget" by the end of every work day. Plaintiff

spiraled into crying at work in her cube and became emotionally despondent as she had become

isolated by the constant badgering, intimidation, and discrimination and was left with no

supervisor to entrust Title VII violations and Personnel infractions to as Johnson, Foster, and

May superimposed the belief it was standard practice at Defendant's workplace to personally

email discriminatory sexist, hostile, ethnic, and religious emails.

59.     On 3/11/08, Plaintiff informed Johnson at his cube that May retaliated against

Page 26   Civil Action No. 10-cv-00189-PAB-CBS

Plaintiff for reporting Montoya 9/4/07 and May sent e-mail "Twenty Reasons Why I Hate

Blondes" to teammates but not to Plaintiff.  Plaintiff asked for Johnson's guidance and support in

reporting May to Defendant's Human Resources department.  Plaintiff stated it was "appalling

and didn't think she could work for May as a TD Ameritrade et al employee beginning 3/17/08

because of Plaintiff's intense lack of trust in May for reporting Montoya and May then having

sent the email "Twenty Reasons Why I Hate Blondes."  Johnson informed Plaintiff to not report

it to Human Resources because "he had sent blonde jokes and other jokes too."

Plaintiff was misdirected by Supervisor Johnson as he showed extreme bias to Plaintiff in not

wanting to report EEOC and Defendant's HR policy violations to Human Resources.  Ms. Park

was petrified of how May could retaliate without Johnson and Defendant's backing.

Plaintiff tried to forgive the daily hostility, malice, intimidation, and hatred teammates exhibited

towards her.  "Let not the sun go down upon your wrath" became the prayer thru Ms. Park's

course of employment with Defendant's.  Plaintiff stated to Johnson she would "transfer to

another TD Ameritrade et al position in 6 months because Plaintiff didn't trust May not to

sabotage her career."

     60.    On 3/17/08, *isolated*, Plaintiff began work as a Trust Processor/Trader for TD

Ameritrade et al.  May remained Plaintiff's supervisor.  Montoya, Banda, and Gary Techmanski,

("Techmanski") who was later asked to resign, and Low were also Ms. Park's teammates.

Daswani worked in TD Ameritrade et al's Customer Credits Department.  During this 6 month

Conversion of Assets, Defendant's staff were housed in cubicles alongside TD Ameritrade et al

staff.  Defendant's Traders were Abate, Naylor, Foster, and Johnson, who worked with Ms. Park.

     61.    On 3/20/08, Daswani sent pornographic email "Dumb Blonde has Sex with Green

Page 27   Civil Action No. 10-cv-00189-PAB-CBS

Sex Frogs" to Ms. Park, Trading Team, and Defendant's staff. Two "motivating factors" in

Daswani sending the sexist and egregious email to Plaintiff, who had blonde hair, were because

Johnson may have told May and Daswani that Plaintiff wanted to report May on 3/11/08 to

Defendant's HR staff for sending "Twenty Reasons Why I Hate Blondes." Daswani was

extremely hate-centered to Plaintiff because he was not selected as a Trader and Plaintiff was

selected to Trade. **Exhibit 16**

    62.    On 3/21/08, Johnson sent "Gender-Identity" bashing email to Plaintiff, May, and

Foster which violated TD Ameritrade et al's Third Party Gender-Identity Bashing

based on Sex policy and their Terms and Condition of Employment. In part, the offensive email

stated, "I will be out of the office for the next two weeks for medical reasons. When I return,

please refer to me as Lucille instead of Steve." Johnson's religion may forbid gay relations.

    63.    On or about 4/20/08, Naylor was despondent and complaining to Ms. Park that

TD Ameritrade et al has discriminated against him on the "basis of his sex" for not hiring him as

a Trader as Banda, Montoya, Low, May, and Ms. Park are female and Techmanski is male.

Naylor was the only known employee of 1,200 employees that had "worked the floor" of the

New York Stock Exchange as an Equities Trader prior to being employed with Defendant's so

his prestigious Trading experience would have been invaluable to TD Ameritrade et al.

Shortly after lamenting to Ms. Park (and Abate perhaps), Naylor emailed a hostile "FUCK

YOU" email to Ms. Park, abasing Defendant's name and the content contained numerous

references to the expletives "FUCK YOU, FUCK YOU, FUCK YOU." Ms. Park was

overwhelmed with the content and Naylor's lethargic state of mind and emailed Abate and we

both ran to Naylor's cube, Abate arriving first, to enlist support and yet Naylor remained

Page 28   Civil Action No. 10-cv-00189-PAB-CBS

despondent and hopeless in character.  Plaintiff engaged in a hostile work environment with

Abate when she replied to Jerry that she was coming to his cube to help him and cc'd Abate.

64.      As a TD Ameritrade et al employee, on 5/8/08 & 5/9/08, May and Montoya were

intimidating, harassing, hostile, and retaliating against Ms. Park for reporting Montoya 8/31/07

and 9/4/07.  May stated to Ms. Park that she might take over Fax Trading and of which Montoya

was trying to *force* her to do so.  Since Ms. Park had a part-time job obligation shortly after

leaving Defendant's workplace, Ms. May was informed of such fact in email and May threatened

Ms. Park (May screamed at the top of her voice, "come with me now" and Ms. Park was

terrified to do so as she felt May would actually hit her).  Ms. Park had an ADA Caregiver

schedule in place which assisted her badly burned father financially.

65.      Ms. Park reported May and Montoya to Podboy and Carpenter for incidents

reported 8/31/07 and 9/4/07 up to current day retaliation 5/9/08 & 5/10/08. Ms. Park requested a

change to a different department which occurred 6/2/08 because she could endure no more

retaliation, hostility, and was suffering extreme anxiety and panic attacks.  On 5/13/08, Ms. Park

emailed Podboy, Carpenter, and Norcross that Montoya didn't like working with Banda (dialect)

**See Exhibit 7.**

Furthermore, Plaintiff reported Foster for retaliating against Ms. Park up to 5/9/08 for reporting

Montoya 8/31/07 and 9/4/07 by withholding Trade details constantly which was in part why

Plaintiff requested the transfer to a different department so Plaintiff would not have to work with

Foster anymore.  **Exhibit 17**

66.      In that meeting 5/9/08, Plaintiff reported Daswani to Podboy and Carpenter for

sending pornographic email "Dumb Blonde has Sex with Sex Frogs" which demeaned and

Page 29   Civil Action No. 10-cv-00189-PAB-CBS

abased Ms. Park on the basis of her sex.

67.     The <u>numbing</u> effects of Foster and Daswani's sexually-charged and perverse

hostile work environment resulted in Daswani and Foster as well as numerous staff from being

fired for emailing pornography at work and then Defendant's and TD Ameritrade et al staff

<u>further</u> "retaliating" against Ms. Park for reporting Title VII discrimination, hostile work

environment, retaliatory treatment, sexually perverse emails, etc.  Defendant's also may have

fired staff because they were over-budgeted.  "Kill two birds with one stone" so to speak.

68.     On 6/16/08, Montoya stated to Gary Eternick ("Eternick"), Defendant's

employee, "one person (Lori) reported one email from long ago and Mike got fired over it."

Upon information, Foster was outside the building on 6/13/08, telling staff he was fired for

emailing <u>pornography</u> "a long time ago" while at Defendant's workplace which leaves

Plaintiff to question if the email Foster was fired over was "Twenty Reason's Why I Hate

Blondes" as Ms. Park never reported Foster for emailing sexist and racist jokes because he and

May rarely sent emails of that demented nature to Plaintiff although he did as such to Abate and

other teammates per Abate 09/2008.

69.     Upon information and belief, Juan Vigil "(Vigil"), or Butch Minter ("Minter"),

or Anna Parker ("Parker"), and/or Barb Wilson ("Wilson") allegedly <u>tampered</u> with Ms. Park's

work as files were disappearing and her daily was destroyed.  On 7/2/08, Plaintiff emailed for

TD Ameritrade et al HR Podboy and Norcross to talk with the four (their pod was next to

Trading and Montoya's) because the work environment was *extremely* hostile towards Ms. Park.

Ms. Park also conferenced with TD Ameritrade et al HR Podboy and Norcross 7/2/08 about how

May's issues were being "swept under the carpet." Podboy and Norcross yelled at Plaintiff to

Page 30   Civil Action No. 10-cv-00189-PAB-CBS

"just drop it with Danette ("May")."   Montoya was *enraged* Ms. Park had a position and Foster

and Daswani were no longer employees of either Defendant's companies.   **Exhibit 14**

70.     On 7/8/08, Defendant's employee Vigil stated to Defendant's and TD Ameritrade

et al staff in front of Ms. Park, "don't tell Lori anything or Lori will report you."

71.     On or about 07/09/08, supervisor Johnson retaliated against Ms. Park and stated,

"none of this would have happened (Foster and Daswani fired for sending pornography, etc.) if

you hadn't bypassed Danette and took it on up to Lisa." Plaintiff stated, "truthfully I did take it

to Danette first and took it up from there."   (Johnson meant Foster wouldn't have been caught).

Upon information and belief Johnson would indeed perjure by stating Ms. Park did not report

Montoya for racist national origin discrimination based on mocking against Banda because he

wanted to "wound and retaliate" against Ms. Park for allegedly getting Foster fired who was

Johnson's best friend at work.   As a Supervisor, Johnson assisted his best friend Foster in

getting fired by not stopping the unlawful, pornographic, sexist, and ethnic harassment emails.

72.     On 7/29/08, Plaintiff gave PCWEB Trade to Aasha Jones ("Jones"), TD

Ameritrade et al Trader.   Ms. Park asked, "will you be recovering the fees?" Johnson hostilely

interjected, "she is doing fine."

73.     Defendant's staff member made Implied Threats towards ALL Democrat's

including the future President Barack Obama, his family, future Vice President Joe Biden,

his family, etc.   On 7/31/08 at 7:22 AM, Minter and Gary Eternick ("Eternick") were talking

about the upcoming 2008 Democratic National Convention and how many trees were put out

at the Pepsi Center.   Eternick stated, "with all the trees out there, construction workers could put

bombs out." Eternick then emphatically stated, "someone should put a bomb out and blow them

Page 31   Civil Action No. 10-cv-00189-PAB-CBS

all up." Minter said to him, "to not talk that way. Don't mention the word bomb up here."

Eternick replied, "who will know?" Eternick jeered, "a construction worker could plant a bomb

in the trees if they wanted to." **See Exhibit 18**

About 10:20 AM, Plaintiff stated, "Gary, don't say the word bomb at work or on this floor." He

looked embarrassed and commented, "Oh, yeah, alright." Plaintiff became traumatized, frantic

with worry, and experienced sharp anxiety and panic attacks as there was no one to report these

violent statements freely to as she couldn't gauge if Eternick meant harm or not at that point.

74.     On 8/7/08, Eternick further created a hostile and intimidating work environment

for reporting. He stated, "what did you do now (Lori)? What ruckus did you cause (Lori)?

There is a reason why you are sitting where you are sitting, etc." Ms. Park was continually

mocked by Defendant's staff for reporting Title VII infractions and other violations. Ms. Park's

hands were shaking so badly she had to hold them between her knees to stop the tremors.

75.     Defendant's staff Minter and Vigil of which Ms. Park took supervision from,

instrumented a sexually-charged, hostile environment with statements such as:

   a. On 8/8/08, Butch stated Cimburek was insecure and bashed him for being gay
      because "you can tell by the way he acts."
   b. Obama was "staying at the Marriott." "Obama is probably staying at the Red
      Roof Inn. No, he's staying at a motel in Commerce City. He's actually staying
      with Oprah (for sex)."
   c. "Bill (Clinton) is going to be down at that place on 15th Street (while the
      Democratic National Convention is on in Denver)." "What's the name of that
      place?" Parker asked at the same time, "what's the name of that place?" Minter
      responded, "La Boheme (The Strip Club)". Minter commented, "signs are
      already up there saying "Welcome DNC." Minter stated, "the sign might as
      well say, "Welcome Bill." Minter snidely stated, "all of the DNC will be there
      at La Boheme anyway." (Families & Children would be watching
      Pornography, Strip Teases, or whatever else goes down at La Boheme).
   d. "I say, life SUCKS. I say Anna, you need a sister." Minter retorted to Wilson,
      "you are too screwed up to have a relationship. I can say that because I am a
      guy." Minter stated, "Anna is the only one being nice to me." Parker stated,

Page 32   Civil Action No. 10-cv-00189-PAB-CBS

    e.  "that's right." Eternick said, "that's only because she wants something from you." Minter replied, "aren't all women like that? Nice only when they want something."

    f.  On 8/7/08, Cline was talking with Plaintiff when Plaintiff witnessed Cindy flip a Defendant's male staffer off with her middle finger.

    g.  Regarding former President Bill Clinton: "Men want Women to FUCK like WHORES" or they'll get their "action" from a Stripper is what Minter alleged so that is in part why ALL Democrats including Children would be at the Strip Club during the 2008 Democratic National Convention per Defendant's staff. Ms. Park has never been to La Boheme so she cannot ascertain what does or does not go on there and is not referring to La Boheme staff as Whores.

76.    On 8/8/08 at 6:51 AM, Minter stated to Parker while they and Vigil were at their cubicles, "you guys are so mean to Lori." (In Latin, "delectatio morosa" means "the habit of dwelling with enjoyment on evil thoughts." Ms. Park is not saying Mr. Clinton knows whores.

77.    Ms. Park was distraught with fear and images of workplace violence and revisited tragedies on American soil such as 9-11-01, Oklahoma City Bombing, Columbine, etc. which flashed continually through her mind and how every calamitous event could have been prevented if people who had knowledge of those sadistic and evil events that were about to unfold would have intervened and reported those planned acts of cruel and inhuman catastrophic violence, then those days could have play out so differently for every family. In turn for reporting, Defendant's, supervisors, and staff have perpetually treated Ms. Park like a monster for reporting the staff making implied threats, etc.

78.    Ms. Park asked herself, "how do you put a price on human life and quantify living with yourself if you knew prior and did nothing to prevent catastrophic events?"

79.    On 8/8/08 at 9:35 AM, Plaintiff met with Maxine Ware, (may have a different last name) Defendant's Supervisor for Shareholder Services in the Vail Room to discuss Eternick's outlandish and implied threats. Plaintiff asked, "do you supervise Gary?" She put a sneer on one side of her face and said, "yes." Ms. Park stated, "I don't know what to do, if I should be talking

Page 33   Civil Action No. 10-cv-00189-PAB-CBS

to Greg or to you." Plaintiff stated, "Gary has been making comments that are very inappropriate

and unprofessional. <u>Gary was talking about the Pepsi Center and how someone could plant a</u>

<u>bomb in the trees to blow everyone up.  He also said a construction worker could plant bombs in</u>

<u>the trees.</u> We should be thinking about work and doing a great job for the company." Ware

remarked, "I am going to the Convention and don't want anything to happen." Ms. Park stated he

was also talking about "Meth Labs and how Fiserv paperwork coming in from Clients

could be thrown away in the shred bin so it wouldn't have to be worked. He said it could end up

in a Meth Lab." Ware stated, "he has been saying stuff and trying to clean it up when I talk to

him about it. I will talk to him today." Ware said Fiserv et al didn't have the money for

Counseling for staff such as Eternick and his wife who were losing their jobs.  The Defendant's

slated to lay off Minter, Vigil, and countless others shortly thereafter.  <u>Parker stated Ware *didn't*</u>

<u>*like working* at Defendant's workplace and they offered her a demotion so she chose lay-off.</u>

80.    On 8/8/08, at 9:45 AM, Ware conference in the Keystone Room with Eternick.

Plaintiff's cubicle was directly outside of this room.  Plaintiff overheard Ware tell Eternick some

of his conversations were inappropriate. He <u>instead</u> asked if the person reporting this was

"someone on the team?"

81.    Plaintiff was overwhelmed with the responsibility of reporting violent threats

towards all upcoming 2008 Democratic National Convention attendees.  Within 15 minutes,

Defendant's supervisor Ware committed one the severest and harshest act's of Defendant's

misconduct with regard to her biased sexual, hostile, retaliatory remark towards Ms. Park.

On 8/8/08, at 9:50 AM, Plaintiff heard Ware state to Dan Karpiel ("Karpiel"), "I <u>never</u> take a

female's (Lori's) word. They just seem so different." Plaintiff was aware Parker and Ware

Page 34   Civil Action No. 10-cv-00189-PAB-CBS

lunched and shopped together often. It was <u>futile</u> to report to HR or Supervisors of either

Defendant's companies at this point as even Cheng, HR failed to follow up on his promises.

82.   On 8/8/08, around 11:19 AM, Cimburek and Ware conferenced in the Keystone

Room about Eternick.  Ware stated to Plaintiff, "I talked to Gary." Ms. Park asked, "do I need to

do anything?" She stated, "no, we are good." Plaintiff expected resolution from Ware, his

supervisor, so Eternick wouldn't act out or harm anyone in the workplace or at the Pepsi Center

(2008 DNC) and Eternick's unprofessionalism and threats would be addressed and resolved.

83.   On 8/8/08, around 2:05 AM, Eternick was again talking to Minter about how

Defendant's client's paperwork could end up in Meth. Labs (<u>Breach of Security could include</u>

<u>Client Social Security Numbers, Addresses, Account Numbers, etc.</u>)

84.   <u>Beginning of Violent Threats and Plaintiff reporting to Defendant's HR days</u>

<u>later.</u> On 8/11/08, at 6:51 AM, Minter arrived at work and walked towards his cube

and loudly hit the top of the large Recycled Paper cart on wheels, with a lock on it (around 4 foot

tall x 3 foot wide) and said "Bob." Plaintiff said to him, "Bob who?" He said, "Bob Beriault."

(Bob Beriault was the President of Defendant's company, in the Denver office). Butch said,

"Bob is in there. "Bob has been in there (the Recycle Paper container) all weekend."

Vigil said, "he's in that container right there." Eternick said, "that is waking Bob up (Bob is in the

Recycled Trash container so to speak).  Cline referenced Beriault's son as a real "Butthead." **See**

**Exhibit 18.** "They should give you guys a punching bag or something. Maybe they will give

you one of those octagon rings and you can beat on each other," stated Eternick. The

conversation turned from 2008 DNC Bomb Threats towards all attendees to threats of violence

towards the leadership of Defendant's company. Ms. Park became immobilized with fear.

Page 35   Civil Action No. 10-cv-00189-PAB-CBS

85.     On 8/11/08, at 8:53 AM, Eternick stated out loud, "Bob is in there drowning." Minter then said, "Bob is in there and that is why I keep kicking it (Recycle Trash Container)." Vigil stated, "do you notice the cart is at an angle towards you, Butch?" Minter replied, "yeah." Cindy Cline ("Cline"), senior trust processor, TD Ameritrade et al staffer taunted, "is Bob in there? Hello Bob.  He's in there looking out the peephole" as she walked by the cart. Dani Morrow ("Morrow"), TD Ameritrade et al Team Lead employee laughed.   Plaintiff took direction from both Defendant's staff listed with the exception of Eternick and is petrified of deep water and knew of someone personally who drowned when she was a little girl.

86.     On 8/12/08 At 6:28 AM, Vigil arrived to work and stated, "Bob, Bob, Bob" as he and Eternick walked by the recycle cart. Eternick, Minter, or Vigil kicked the cart and Vigil blared, "wake up, Bob." At 6:33 AM, Parker and Minter were saying Bob was in the Recycled Paper bin and Parker stated about Bob, "let me out, let me out."
On 8/12/08, at 6:33 AM, Parker and Minter were talking in a low voice about Bob being in the Recycled Paper bin and Anna stated about Bob, "let me out, let me out."

87.     On 8/12/08, at 6:55 AM, Plaintiff went to Parker's cube to ask about a Dividend Suspense item being out of balance and Minter blared to Ms. Park, "what are you doing down here? Don't you have a job to do?"  Ms. Park left their work area petrified as the hostility and rage were unbearable.
On 8/12/08, at 7:57 AM, Eternick walked by the Recycle Paper Cart and said to Minter with paper in hand, "I am going to throw this paper on Bob."

88.     On 8/12/08, at 8:02 AM, Anna was at her cube talking about needing to buy paper plates for the Cash Management Team luncheon. She jeered, "what's her name is going to

Page 36   Civil Action No. 10-cv-00189-PAB-CBS

Walgreen's to buy pop." Minter said, "she is a member of your team and you call her "what's her name?" Vigil said, "yeah, why do you call her what's her name?"

On information and belief, Parker's retaliation, intimidation, and hatred for Ms. Park was evident even though Parker was her supervisor because Foster and others were fired and Ms. Park reported May and Montoya. (Discovery will further prove retaliation by countless staff).

89.      On 8/12/08, at 11:15 AM, Minter belligerently stated to Barb, "I am not going to tolerate anything. I will punch someone in the mouth."

90.      On 8/12/08, Gary stated, "Bob."  Cindy asked him, "are you feeding Bob?"

91.      On 8/13/08, around 6:00 AM, Plaintiff witnessed Eternick state to Parker, "I wouldn't care if the whole thing (our building at 717 17th Street, Denver, CO) burnt down." Ms. Park thought of tenants such as Johns Manville, a Berkshire Hathaway company, real-estate magnate Frederick Ross Co., George K. Baum, a most prominent regional banking firm, TMG Marketing, etc., who could be harmed, badly burned, or killed because of Eternick's psychotic and despondent statements and further knew she had to intervene for the good of all people whether it cost Ms. Park her job or not.

92.      On 8/13/08, Vigil arrived to work and said, "Bob is still here." On 8/13/08, at 6:36 AM, enraged, Minter was walking towards the kitchen and slammed his hand down hard on the top of the Recycle Cart and said, "wake up Bob."

93.      On 8/13/08, Eternick stated, "somebody in Arkansas shot a Senator ten minutes ago.  A Bill Gwatney.  They shot and killed the guy who shot Gwatney so he won't have to be sentenced. Oh the suspect may not be dead."

94.      Minter sneered, "the French still hate us for having to bail them out of World War

Page 37   Civil Action No. 10-cv-00189-PAB-CBS

II." Ms. Park has French ancestry and believes that England and America, among other great

Countries, were allies who assisted in intervening with the French so the many faces of evil in

WWII would not be allowed to *freely* roam.  It is disgrace to *degrade* French WWII war heroes.

95.     Butch obnoxiously stated, "it's the American dream. It's all about youth and

beauty.  I don't see why you don't embrace that Anna."

96.     On 8/13/08, about 9:15 AM, Johnson called Plaintiff and retorted, "I noticed you

didn't put in your email that someone left a voice mail message for Rejects. Sarla is confused if

she has to call the Fund company again or not."  Johnson's mocking, retaliation, and intimidation

proved to Ms. Park that his false cloak of "Christianity" was really the heart of Satan before her.

Banda came to Ms. Park later that day and recused Johnson's accusations.

97.     On 8/14/08, at 9:43 AM, Eternick looked at the Recycle Cart and stated to

everyone, "<u>Bob is right here. Hit him in the head.</u>"  Sadistic.  It left Ms. Park further tormented

and traumatized as she was unsure if she should call the Colorado Attorney General about the

2008 DNC bomb threats, burn down the building statement, and threats towards Mr. Beriault.

The hostile-charged work environment and retaliation against Ms. Park for reporting so many

had left Ms. Park deeply distraught of who to turn to for help so Ms. Park wouldn't be harmed,

injured, or killed as May, Montoya, Wilson, Parker, Eternick, Vigil, Low, Minter, and others

rage, hatred, workplace violence, and retaliation was clearly the daily agenda against Ms. Park.

98.     On 8/14/08, Minter said a meteor would take out 1/3 to 1/2 of population.

Eternick retorted, "Omaha (TDA's headquarters) will be the first it hits."

99.     Minter demeaned women freely on the basis of their sex.  Minter stated to Wilson,

"here's your first mistake. No one has authorized you to think. You are authorized to follow."

Page 38   Civil Action No. 10-cv-00189-PAB-CBS

100.   <u>Respondeat Superior</u>. On August 14, 2008, Ms. Park read a 4 page outline to

HR Zimmerman of incidents while hysterical, crying inconsolably, and having severe stress,

anxiety, panic attacks, breathing problems, dizziness, nausea, etc. Plaintiff reported "Implied

Bomb Threats" of violence towards <u>all</u> upcoming Democratic National Convention Attendees,

threats towards Mr. Bob Beriault, retaliation by Defendant's and TD Ameritrade et al staff,

intimidation, hostile work environment, etc. to Zimmerman, Defendant's HR Director. Ms. Park

expressed her dire concern and safety in working around work around Montoya, May, Parker,

Wilson, Minter, Vigil, and others due to the <u>enraged</u> hostile work environment, retaliation, for

reporting Daswani, Foster, May, Montoya, and other and threats Ms. Park witnessed.

Zimmerman was informed of the email "Twenty Reasons Why I Hate Blondes" that May sent

9/07 to teammates and Zimmerman stated Daswani, Foster, Turcios, and others were "fired for

emailing pornography at work." Zimmerman made a copy of the 4 page outline and promised

she would "make it my (Zimmerman's) problem" instead of Ms. Park having to deal with and

worry about these issues. Zimmerman, HR,   revealed Foster, Daswani, and Turcios, etc. "Status

of Discharge" and created Defamation of Character liability for Defendant's.

101.   In this meeting 8/14/08, Zimmerman advised Ms. Park to take time off from work

and she would advise Podboy and Cimburek of the events and Ms. Park's concerns about safety

working around staff of both Defendant's. **See Exhibit 18 & 19** (Zimmerman has Exh. 18 &19)

102.   Plaintiff took 2 weeks Short-Term Disability due to fear of Defendant's staff and

TD Ameritrade et al staff harming or killing her for reporting Title VII and Personnel violations

as staff had been fired May and June 2008. **Exhibit 20**

103.   In light of continued harassment and egregious retaliation for reporting, stress,

Page 39   Civil Action No. 10-cv-00189-PAB-CBS

severe anxiety, panic attacks, etc., Ms. Park determined she needed to protect herself from

further harassment, discrimination, and psychological harm so she filed an EEOC Charge

against Defendant's and TD Ameritrade et al on 9/15/08.

104.   On 9/4/08, Ms. Park returned to work at TD Ameritrade et al on floor 24 and

upon the day of her return up to December 4, 2009 and thereafter, Ms. Park was discriminated

against sexually, racially, ethnically, retaliated for reporting incidents prior to 9/4/08 from team

leads, supervisor, overall supervisor Cimburek, HR, President, and Chairman of the Board.

This resulted in Ms. Park documenting and digitally taping egregious discrimination, obnoxious

hostile work environment, implied and actual threats, etc., which left her petrified for her life

and despondent which is further chronicled in Civil Action No. 10-cv-00188-PAB-BNB.

105.   On or about 09/06/08, Abate informed Plaintiff Foster sent nasty, sexually

harassing, and ethnic joke emails to Abate and others which were in violation of Defendant's

Human Resources policy and Title VII.  Abate stated that May had been unsure if TD

Ameritrade et al was going to allow her to keep her job as Trading Supervisor because of

incidents Plaintiff reported to TD Ameritrade et al HR May 2008.

106.   On 1/27/09, there were about 4,400 TD Ameritrade et al staff to choose from to

be laid off.  May, Montoya, Teed were 3 of 7 *suspiciously* "laid off" from TD Ameritrade et al

Denver site from the vital Trading and Dividends Team out of 144 employees.  "Dispose of

the perpetrator and retaliator" to prevent further harm for Defendant's and TD Ameritrade et al's

Civil Case's even though Legal Counsel illusion: "nothing happened, Ms. Park."

107.   On 3/9/09, Banda informed Plaintiff that through the summer and fall of 2007 at

Defendant's workplace, "Laura ignored me (Sarla) if she had to talk about work (because of

Page 40   Civil Action No. 10-cv-00189-PAB-CBS

Banda's strong Indian dialect).   She talked a lot about her personal life. Laura did most of the

talking when she spoke to me and I didn't say much. I had a "feeling" Laura was gossiping"

(with teammates about teammates). Banda then revealed to Plaintiff, "Laura talked about Lavesh

not doing his work.  Laura also talked about Jerry.  Laura talked to Frank a lot (at his cube)."

Like other Trader's, Banda became like a "silent therapist" for Montoya to rage her diatribe on.

108.    On 3/16/09, Banda stated to Plaintiff, "Laura didn't like me (Sarla) coming to talk

you at your cubicle)."

109.    August 2009, Ms. Park delivered a 3 page letter to Defendant's Denver Offices

addressed to Jeff Yabuki, CEO & President of Fiserv Inc., Bob Beriault, President of

Defendant's Denver Office, and the Defendant's Board of Directors.  **Exhibit 21**

110.    On 9/1/09, Plaintiff reported Wilson to Cimburek for threatening to hit Ms. Park

and that Wilson made several *racist* references to Banda's National Origin dialect to Ms. Park

while employees of TD Ameritrade et al of which 3 weeks later, Banda was *unjustly* "laid off"

During the 55 minute digitally taped conference with Cimburek, he stated Foster, Daswani (of

whom he supervised at the time of firing), Turcios, and others were fired for emailing

inappropriate content at work.  Cimburek violated their "Status of Discharge" rights.

Cimburek stated it was addressed with Eternick and Minter about the 2008 DNC bomb threats

but Eternick was never fired.   (Digital taped conversation and transcribed for the Jury).

Ms. Park informed Cimburek she was petrified upon her return to work 9/4/08 at TD Ameritrade

et al and no one came to her defense and she endured a renewed pattern of misconduct and

retaliation for reporting by various supervisors of whom she took daily direction from, sexual

harassment, hostile work environment, racial and ethnic harassment, intimidation, implied, and

Page 41   Civil Action No. 10-cv-00189-PAB-CBS

actual threats, etc. which left Ms. Park bereft at Defendant's role in resolving Ms. Park's

concerns addressed with Zimmerman 8/14/08.  This lack of respect towards Ms. Park's Civil

Rights further altered her terms and conditions of employment with TD Ameritrade et al in such

a way that it harmed her psychologically, physically, emotionally, financially, daily work

experience, and otherwise due to the start of Discrimination at the hand of Defendant's in 2007.

Abhorrent and repugnant treatment of Ms. Park became a persistent condition of employment as

she was further terrified for her life, mocked, degraded, ridiculed, and left isolated to endure

deep despondency at TD Ameritrade in part because she filed an EEOC Charge to end the gross

acts of misconduct by three levels of supervision at Defendant's workplace and the ill-managed

concerted effort of Zimmerman.

111.    On 9/1/09, Plaintiff learned from Cimburek that Eternick was never fired by

Defendant's for making bomb threat's geared towards all Democrats who would have been

attendance at the 2008 Democratic National Convention as well as the implied threats towards

Beriault, etc.  Ms. Park believes it is right to fight *hard* for her country, America, to keep it safe.

112.    Workplace violence unfortunately runs rampant in America.  Parker referred

to Eternick as "crazy Gary" on 1/9/09 as he was still depressed and unemployed per Parker.

113.    Ms. Park learned through the media that President Obama had visited Colorado

September or October 2009.  Upon learning Eternick was not fired nor turned into Colorado

Law Enforcement, nor the FBI, Ms. Park emailed the Denver FBI, Denver U.S. Attorney's

Office and several Senator's on or about 11/15/09 to investigate Eternick's statements and

the nation's top law enforcement could gauge whether he would do any type of harm to

President Obama, Vice President Biden, their families, or any Democrat if they were to visit

Page 42   Civil Action No. 10-cv-00189-PAB-CBS

<u>Denver, CO in future</u>. **Exhibit 22** (3 excerpts of 9 page email to Denver FBI, Denver U.S. Attorney's Office, several Senator's, and Rev. Al Sharpton.

113.   Ms. Park addressed in the email on or about 11/15/09 the Denver EEOC handling of all EEOC Charges filed as Colleen Scaramella ("Scaramella") committed racial bias towards Ms. Park when she addressed a harsh and indecent TD Ameritrade et al racial remark with Scaramella who was removed from Ms. Park's EEOC cases only to be later put back on them and which she <u>promptly</u> closed them, which hindered possible Mediation with Defendant's Attorney's Brownstein, Hyatt, Farber, Schreck, LLP.  Ms. Park also involved Nancy Sienko, Denver EEOC Director, Rayford Irvin, Regional EEOC Director, and Stuart Ishumaru, National EEOC Director in discussions which were later turned over to the FBI.

114.   In same email to U.S. Attorney's Office and FBI, Ms. Park asked for the email "Twenty Reasons Why I Hate Blondes" to be recovered as Defendant's have committed perjury as well as the concern for Johnson's "selective amnesia" and perjury.

115.   Ms. Park sent letter to Oprah Winfrey; other emails ensued to be revealed at Trial.

116.   On 12/7/09, Plaintiff went on Short-Term Disability in part due to the "chopped up rattlesnake threats" made by Ann Brown, Team Lead at TD Ameritrade et al 12/3/09 and 12/4/09 which were turned in to the FBI and will begin Long-Term Disability June 2010.  Ms. Park sees a Therapist weekly and Psychiatrist.  The <u>barrage</u> of indecent discrimination, harsh retaliation, hostile work environment, obnoxious sexual, racial, and ethnic harassment, threats, implied threats, chronic stress, fraud, SEC, FBI, Madoff Scandal ties mentioned on page 43 & 44 etc. have taken their toll on Ms. Park's well being and her safety is still in question.  **Exhibit 22A**

117.   On or about 12/24/09, Defendant's staff informed Plaintiff that Zimmerman, who

Page 43   Civil Action No. 10-cv-00189-PAB-CBS

was an Officer of Defendant's company, Lincoln Trust, was *strategically* "laid off" which may

have been instigated on information and belief Plaintiff informed Yabuki, Beriault, and

Defendant's Board of Director's August 2009 letter that discrimination and it's evil effects

would not have occurred if Defendant's and Zimmerman would have implemented measures and

training in place to prevent Title VII violations.   (Zimmerman allegedly performed the head HR

function for over 1,200 staff at one point for Defendant's).

118.    On 2/8/10, Plaintiff emailed the Colorado Attorney General for assistance with

regard to the lack of response from the Denver FBI.  (High marks for the C.A.G.'s office)

The next day, XXXX from the Denver FBI called and said they would investigate various

charges. Ms. Park supplied the two additional EEOC Charges that the Denver EEOC "purposely

lost" so the EEOC is now under investigation by the FBI.  XXXXX stated he would email Ms.

Park for additional material facts and failed to do so thereafter.   It should not take a tragedy to

get resolution. **Exhibit 23**

119.    On 3/28/10, Ms. Park sent 3 page letter to President Obama, Vice President

Biden, U.S. Attorney Eric Holder, Jr., and several Senator's regarding the EEOC, Denver FBI,

and Denver U.S. Attorney's Office and will be working with to resolve select concerns. **Exhibit

24**

120.    Ms. Park will be contacting the alleged victim and U.S. Attorney's Office shortly

to confer regarding "witness tampering" allegations so this evidence may be presented at Trial.

121.    Ms. Park digitally taped employee who had "direct ties" with Frank DiPascali, Jr.,

"hedge our valuations" point man for Bernard Madoff of Madoff Securities, and *future* "person

of interest for the SEC, FBI, IRS" with relation to Federal cases listed in paragraph 121 and other

Page 44   Civil Action No. 10-cv-00189-PAB-CBS

cases tied to the "RAI-800 Accounts" with relation to Civil No 09-cv-00752-CMA-CBS,

W. Cohen v. Fiserv et al, & E. Weinstein v. Fiserv et al, etc. discussing Defendant's role

with the "800 Accounts for Retirement's Accounts Inc." (*)  This evidence should shed light on

**who** has details that may and/or will confirm violations of IRS Code ↄ 408, 26 C.F.R. ↄ1.408-

2(d), 26 C.F.R. ↄ1.408-2(e)(v)(4)(ii), 26 C.F.R. ↄ 1.408-2(b)(5), C.F.R. ↄ 1.408-2(e)(vii) as this

taped evidence may strongly confirm Defendant's fiduciary breach of contractual and fiduciary

duties and further substantiate Irving Picard's statement that BMIS monthly account statements

sent by BMIS often reflected stock trades at prices "outside the daily range" for such securities

traded in the market on the days in question," a fact which should have easily been confirmed by

Fiserv and the Trustee Defendant's when they valued the securities." Per Picard, "no securities

were purchased for customer accounts perhaps as much as 13 years, from as early as 1995." Ms.

Park discovered the lawsuits of Weinstein and Cohen on the web on 5/10/10.  Everyone should

be able to look a victim squarely in the eyes and live knowing they acted genuinely and honestly.

Plaintiff later witnessed a staffer mock Plaintiff's in stating Defendant's employees would not

come forward with material facts so it would be hard to prove Defendant's alleged wrong-doing.

(Her statements may be on digital tape, yet to be transcribed). Ms. Park wants all lies to

stop and this information *may be the start to unravel lies.*  No lawsuit on the web *nor does the*

*SEC's lawsuit against DiPascali name **him** with ties to the Defendant's,* even though they had

relations and if and what Defendant's participation of fraud upon Clients, aiding and abetting,

conspiracy, etc. was with relation to the estimated $1 billion dollars in losses to the 800 victims.

Judge Schaffer will know what to do to help Ms. Park with these details in paragraph 121 as

integrity matters. Ms. Park also witnessed a Defendant's staffer state Beriault mentioned in

*referenced Cohen v. Fiserv et al Complaint in Denver Federal District Court (see asterick (*) on page 44 for quotes

Page 45   Civil Action No. 10-cv-00189-PAB-CBS

Defendant's Town Hall Meetings that he "was trying to unload the remaining assets TD

Ameritrade et al refused to purchase" to another buyer in 2007 or 2008 because they were not

"money makers." Intriguing fact for the FBI/SEC to investigate Beriault's statements per

lawsuits in paragraph 121. Digitally taped the staffer. The stress is unbearable for Ms. Park.

## FIRST CLAIM FOR RELIEF
### Race/National Origin Discrimination and Retaliation Under 42 U.S.C. § 1981 et seq., and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986

122.    Plaintiff incorporates by reference paragraphs 1 to 121 as though fully alleged

herein.

123.    Banda is Indian, female, a member of a protected class based on race, ethnicity,

and sex. Ms. Park is female, Caucasian, and of French ethnicity.

124.    Defendant's have incurred Superior Respondeat liability due to their defiance and

conduct and through their agents, staff, and supervisors as they were a direct cause of Ms. Park's

injuries, damages, and losses for reporting racist National Origin bashing based on dialect

because Johnson and May chose "selective amnesia" with malice and reckless indifference to

Ms. Park's rights to oppose within the meaning of § 1981. Ms. Park is protected against

impairment by non-governmental discrimination and impairment under color of State law for

opposing racist Indian National Origin Discrimination and racist Caucasian bashing because Ms.

Park has equal rights as does every race.

125.    42 U.S.C. § 1981 provides in pertinent part: prohibits race discrimination in the

making and enforcing contracts which includes terms, privileges, conditions, and enjoyment of

all benefits of employment and the contractual relationship. It prohibits racial discrimination

Page 46   Civil Action No. 10-cv-00189-PAB-CBS

against whites and the non-white population . Race is the "motivating" factor. Montoya was

supervising Banda's daily work functions. Racial Animus Motivation will be proven at Trial

because the email "Twenty Reasons Why I Hate Blondes" exists and was the direct retaliatory

factor in May sending the email to teammates days after reporting Montoya.

126.   Section 1981 prohibits both discrimination and retaliation by an employer for

bringing claims of racial and ethnic discrimination.

127.   Defendant's described hateful and planned abusive conduct was orchestrated by

supervisors May, Montoya, Foster, Johnson, Daswani, Minter, and others who intentionally

discriminated and retaliated against Ms. Park based on her reporting racist National Origin

Origin based on Indian dialect which created a two year plus hostile, retaliatory work

environment.

128.   Defendant's violated Ms. Park's right to make and enforce contracts and then

directly ratified, sponsored, and approved a malicious plot to instigate so no reasonable

investigation would take place and supervisors took no corrective action against Montoya.

129.   Supervisor May viciously retaliated against Ms. Park with the sexist email and

then Foster conspired to sabotage, retaliate, and subject Ms. Park to malicious adverse treatment,

and harass Ms. Park through the course of her employment with Defendant's and TD Ameritrade

et al for originally reporting and opposing Montoya's racist and ethnic-charged words.

130.   Defendant's, the company's employees, and also third party employees while Ms.

Park was employed as a TD Ameritrade et al staffer, conspired to deprive Ms. Park of her civil

and equal rights and protections under the laws as a continual hostile, racial, and retaliatory

environment prevailed.   Defendant's knowingly and intentionally engaged in a pattern and

practice of discrimination against racial and ethnic minorities of which Ms. Park is a member.

131.    Title VII prohibits both discrimination and retaliation by employers for bringing

Claims of discrimination based on race and national origin.

132.    Defendant's are liable for the acts and omissions of their supervisors, agents, and

employees.  Since they engaged in with malice and reckless indifference to the federally

protected rights of Ms. Park opposition to racist acts, she is entitled to compensatory, special,

and punitive damages as plead throughout this Amended Complaint as well as attorney fees and

costs under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 1988.

133.    Montoya engaged in with malice and reckless indifference to the federally

protected rights of Ms. Park who is Caucasian which violates 42 U.S.C. § 1983 whereas

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of

the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

in an action at law, suit in equity, or other proper proceeding for redress."

### SECOND CLAIM FOR RELIEF
### Sex Discrimination in Violation of 42 U.S.C. § 2000e-2 et seq., as amended,
### 42 U.S.C. § 1985, 42 U.S.C. § 1986

134.    Plaintiff incorporates by reference paragraphs 1 to 133 as though fully alleged

herein.

135.    By the acts and practices described above and the Statement of Facts to be

presented in Court, including but not limited to creating a hostile work environment for Ms. Park

because of her sex, female, of which she is a member of a protected class, which was severe and

pervasive that the pattern of misconduct interfered with her daily work performance.  Supervisor

Page 48   Civil Action No. 10-cv-00189-PAB-CBS

May and Team Leads Foster and Johnson set the tone for vicarious liability by their intentional, gross misconduct, and allowance of sexist and hostile emails.  Foster's pervasive retaliation for reporting Montoya provided a repugnant and continuous hostile work environment which severely impeded Ms. Park's work performance.  Daswani's unwelcome and lewd statements and emails created an intimidating, hostile, and prevailing offensive work environment. Supervisor Johnson had superior trading knowledge and yet his personal conduct in the workplace was atrocious towards women and minorities, especially towards Ms. Park.  These indecent acts explicitly and implicitly became a term and condition of employment for Ms. Park which are a violation of 42 U.S.C. § 2000e-2 et seq., as amended.

136.    Defendant's are liable as aider and abettor of the discrimination against Ms. Park. By ignoring Ms. Park's complaints of discrimination, Defendant's wantonly and willingly violated her federally protected rights.  Ware decimated Ms. Park for opposing/reporting threats.

137.    By ignoring Plaintiff's complaints of discrimination as a Defendant's employee and third party TD Ameritrade et al employee, Plaintiff is now suffering and will continue to suffer irreparable harm and monetary damages for mental anguish and humiliation as a result of Defendant's discriminatory and hostile work environment acts.

### THIRD CLAIM FOR RELIEF
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1985, 42 U.S.C. Section 2000(e)(3)(a), 42 U.S.C. § 1986**

138.    Plaintiff incorporates by reference paragraphs 1 to 137 as though fully alleged herein.

139.    Ms. Park is female and thus a member of a protected class.

140.    Ms. Park complained about discriminatory violations, treatment, and hostile

Page 49   Civil Action No. 10-cv-00189-PAB-CBS

work environment and violations were ignored by supervisors so it became her terms,

conditions, and privileges of employment to be "strategically discriminated against."

141.    By the acts and practices described above, including but not limiting to force

Ms. Park to ultimately stop working at TD Ameritrade et al, Defendant's further allowed before

and after 8/14/08 retaliation as a TD Ameritrade et al staffer, against her terms and conditions of

her employment for opposing unlawful employment practices in violation of Title VII.

142.    Supervisor's Johnson, Foster, and teammate's adverse actions and treatment were

severe and pervasive enough that Plaintiff continually began stuttering and disrupting

conversations due to the hostile and repugnant treatment, resulting in extreme nervousness and

anxiety and panic attacks as well as crying fits and deep depression.  Her workload spiraled

downward with Fund Companies and Abate.  On 12/25/07, Johnson verbally reprimanded Ms.

Park to "work Rejects faster" and Ms. Park informed him Foster was retaliating for Ms. Park

reporting Montoya 8/31/07 & 9/4/07 and was instead assisting Montoya and others for

non-price protection Trade issues instead of completing critical deadlines with Ms. Park.

**Exhibit 25**

143.    Podboy and Norcross told Plaintiff to "drop it (the Defendant's investigation of

2007 and thereafter and reporting further retaliation) with Danette" on 7/2/08 at 9 AM so there

was no Defendant's agent to report third party retaliation to with exception of the EEOC.

144.    Defendant's staff retaliated and provided consistent adverse treatment, and hostile

work environment *inter alia* (emails and documentation), against TD Ameritrade et al staffer

Ms. Park for months after 5/9/08 for opposing discrimination and staff being fired.

145.    Defendant's conduct and through its supervisors, agents, third party employees,

Page 50   Civil Action No. 10-cv-00189-PAB-CBS

and staff were the proximate cause of Ms. Park's injuries, damages, and losses. Defendant's

conduct was engaged with malice and with reckless indifference to Ms. Park's federally

protected rights within the meaning of Title VII which makes them liable for willful and

planned acts to violate Ms. Park's federally and state statutory rights to be free from retaliation.

146.   Ms. Park is now suffering and will continue to suffer irreparable injury and

monetary damages and damages for mental anguish and humiliation as a result of Defendant's

retaliatory acts for reporting which violated Ms. Park's rights.

**FOURTH CLAIM FOR RELIEF**
**Discriminatory or Unfair Employment Practice Under "CADA" Gender/Gender Plus**

147.   Plaintiff hereby incorporated paragraphs 1 to 146 as though fully alleged herein

and pursuant to all state common laws with relation to "CADA."

148.   Colorado law requires posters to be placed where employees have access to them

on the following subjects: anti-discrimination, unemployment compensation, worker's minimum

wage, and compensation, and (for employers subject to the Minimum Wage Order). City of

Denver also requires a poster under its anti-discrimination ordinance.  Defendant's failed to

comply with these orders at the workplace on floor 28 of 717 17th Street, Denver, CO 80202.

149.   "CADA" prohibits discrimination based on a person's sexual orientation,

religion, disability, race, creed, color, sex, age, national origin or ancestry and of which

Ms. Park is a member of protected female class.  She was harassed during the course of her

employment per religion, disability, race, color, and sex which is illegal pursuant to "CADA"

statutes thus creating a retaliatory, hostile, and racist work environment which Defendant's are

liable for.  Ms. Park endured bystander gender-identity bashing of staff which further violates

"CADA's" laws on sexual orientation.

Page 51   Civil Action No. 10-cv-00189-PAB-CBS

150.   Pursuant to C.R.S. 24-34-401 & 402 (2004), Defendant's enforced discriminatory and/or unfair employment practices upon Ms. Park as she was dogmatically harassed (hostile work environment) during the course of employment and May and Johnson failed to initiate a reasonable investigation and take appropriate remedial action against Montoya.

151.   Defendant's aided, abetted, incited, compelled, and/or coerced the doing of acts defined in C.R.S. 24-34-401 and 402 (2004) as discriminatory and/or unfair employment practices and are so liable while Ms. Park was a Defendant's and TD Ameritrade et al staffer.

## FIFTH CLAIM FOR RELIEF
### Promissory Estoppel & Breach of Contract, 42 U.S.C. § 1985

152.   Plaintiff incorporates by reference paragraphs 1 to 151 as though fully alleged herein.

153.   Defendant's and others in positions of leadership should have known of the conduct and didn't exhibit reasonable care to prevent these Title VII and Defendant's Personnel violations. They in turn were defiant with respect to the enforcement of Defendant's internal rules, guides, policies, procedures, and practices.

154.   Plaintiff's reliance upon the assignment of work to her by Plaintiff's employer, Defendant's created promissory estoppels for her performing the services and taking the actions she did.   Ms. Park performed her work in a satisfactory manner during her tenure. Ms. Park continually tried to go the extra mile and establish a harmonious working relationship with each team member but retaliation, intimidation, and denigration continued repeatedly from Johnson, Montoya, Foster, May, Daswani, and others.

155.   Plaintiff relied upon representations by her employer and changed her position in reliance thereon her reliance was reasonable and justified. In Colorado, there are two exceptions

Page 52   Civil Action No. 10-cv-00189-PAB-CBS

to the at-will rule based upon the legal principles of "public policy" and "implied contract." First,

the public policy exception simply means that an employee cannot be fired for performing a

legal duty or exercising a legal right. Plaintiff exercised her legal right to oppose various forms

of Title VII discrimination and also by filing an EEOC Charge.

Second, a binding employment relationship may be found to have been created by an implied or

an express contract. The contract theory usually arises in situations in which procedures outlined

in personnel handbooks are construed as a contract between the employer and employee.

156.    Plaintiff has determined her rights, conditions, terms, and privileges of

employment with Defendant's have been purposely, with evil intent, and catastrophically

violated by the President & CEO, Yabuki, Beriault, The Board of Director's, various levels

of Supervision from May, Foster, Johnson, Ware, Daswani, and others, as well as Human

Resource's Zimmerman.   Third Party hostile work environment, intimidation, and retaliation

further violated Ms. Park's rights as a TD Ameritrade et al staffer.

### SIXTH CLAIM FOR RELIEF
**Negligence, 42 U.S.C. § 1985, 42 U.S.C. § 1988, 42 U.S.C. Section 2000(e)(10)(a)(b),
42 U.S.C. § 1986**

157.    Plaintiff incorporates by reference paragraphs 1 to 156 as though fully alleged

herein.

158.    Plaintiff was subjected to continual malicious, adverse treatment, and hostile work

environment for being pursuant of a lawful work environment and with relation to enforcing her

Civil Rights with respect to the terms, conditions, and privileges of employment at Defendant's

workplace.  Third Party harassment and retaliation for reporting violated Ms. Park's rights.

159.    Defendant's have been defiant in it's abandonment of its responsibility and

Page 53   Civil Action No. 10-cv-00189-PAB-CBS

unforthcoming in its violations of it's own by-laws with regard to May, Montoya, Foster,

Johnson, Daswani, Beriault, Eternick, Vigil, Minter, Yabuki, Zimmerman, Ware, and others.

160.    May and Johnson failed to diminish the effects of discrimination.  Ware created

a sex-biased workplace against Ms. Park and failed to monitor/end Eternick's threatening and

hostile-charged work environment.  Zimmerman failed to eradicate the effects of retaliation for

reporting when Ms. Park informed Zimmerman on 8/14/08 of the constant retaliation and hostile

work environment from Montoya, May, Low, Parker, Wilson, Eternick, Vigil, Minter, etc.

161.    Ms. Park is now suffering and continues to suffer irreparable harm and monetary

damages for mental and physical disabilities and anguish due to the planned negligence, breach

of duty, acts and omissions of Defendant's.

## SEVENTH CLAIM FOR RELIEF
### Outrageous Conduct, Threats, & Implied Threats, 42 U.S.C. § 1988, 42 U.S.C. § 1986

162.    Plaintiff incorporates by reference paragraphs 1 to 161 as though fully alleged

herein.

163.    Defendant's overt acts and machinations to discriminatorily, racistly, sexually,

retaliatorily punish and degrade Ms. Park, *inter alia* by repeatedly ignoring reports of

discrimination, hostile work environment, and adverse treatment meant Ms. Park was not

welcome at Defendant's workplace.

164.    The discrimination was pervasive, malicious, and regular.  Threatening words of

Beriault drowning, being bashed in the head, "locked in a large recycle cart," Eternick's

despondent statement about "burn down the building" at 717 17th Street, Denver, CO, as well

bomb threats towards all Democratic National Convention Attendee's  meant Plaintiff was no

Page 54   Civil Action No. 10-cv-00189-PAB-CBS

longer safe in the workplace and was ridiculed for her sex by Ware for reporting the 2008 DNC

bomb threats as Defendant's workplace had become increasingly violent and sadistic in nature.

Thus, all Democrats including children would be participating in pornography while in Denver at

the 2008 Democratic National Convention per Minter.

155.   Defendant's were negligent in their management of staff and of TD Ameritrade et

al staff as they allowed supervisory and staff misconduct to freely reign.

156.   Defendant's were negligent in their management of Plaintiff due to the nature of

repetitively obnoxious, hostile, harassing, and sexually harassing work environment and now

Plaintiff is on ongoing Short-Term Disability due to violent, threatening, intimidating, hostile,

sexually-charged incidents towards her and witnessed as a Defendant's employee

while working alongside Fiserv et al staff during the "Conversion of Assets"

during the spring, summer, and fall 2008 of which TD Ameritrade et al purchased said Assets.

157.   Reporting violations and Title VII discrimination to supervisors or HR proved

futile.  Example:  the bomb threat perpetrator, Eternick and others are rewarded with a lavish

bonuses after Ms. Park reported their egregious threats and malicious conduct.  Zimmerman

and supervisor's May and Johnson were instrumental in getting Foster, Daswani, Turcios, and

"you don't know how many others" per Zimmerman on 8/14/08 fired for emailing pornography

even though May and Johnson emailed equally discriminatory and unlawful email content to the

very staff they supervised.   Zimmerman failed to have protective (EEOC) measures in place.

158.   After Ms. Park opposed discrimination and/or filed EEOC Charges against both

Defendant's, Legal Counsel then said: "nothing happened."  Of the original 10 Defendant's

Trading employees:  Supervisor May, Teed, Montoya and Banda were *suspiciously* "laid off" at

TD Ameritrade et al; Daswani, TD Ameritrade et al staffer and former Senior Trader was fired

Page 55   Civil Action No. 10-cv-00189-PAB-CBS

for emailing Pornography to Ms. Park.

Defendant's fired Team Lead Foster for emailing Pornography (perhaps email "Twenty Reasons

Why I Hate Blondes") shortly after 5/9/08 when Ms. Park reported Daswani. (confirmed via

digital tape by Supervisor). Abate, Naylor, Minter, Vigil, and Ware were laid off.

Johnson was retained by Defendant's *"so they would have one witness left"* to testify against

Ms. Park (Johnson *supposedly* had less discriminatory baggage than May in his cupboards) but

the material facts remain, Johnson denigrated Ms. Park on the basis of her sex and it can be

substantiated *inter alia* he perpetually created a hostile, retaliatory, and sexist work environment

so Defendant's in truth have no credible witnesses to present to the Jury.

Plaintiff's Discovery shall prove enlightening for the Court and Jury. Digital tapes and other

facts exist.

159.    Ms. Park is employed at TD Ameritrade et al and on STD presently and will go

on LTD shortly.

160.    Plaintiff is now suffering and continues to suffer irreparable injury and monetary

damages for mental anguish and humiliation as a result of Defendant's threats, implied threats,

and outrageous conduct.

### EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988

161.    Plaintiff incorporates by reference paragraphs 1 to 160 as though fully alleged

herein.

162.    Defendant's were negligent in their management of Plaintiff and election to instill

and incorporate a safe and lawful work environment. Upper Management, Supervisors, Team

Leads, and staff knowingly, with evil malice, instilled a raging hostile work environment that

Page 56   Civil Action No. 10-cv-00189-PAB-CBS

degraded and abased women and minorities, used fear and terror, threats and implied threats,

which denigrated and humiliated Ms. Park and of which materially altered her terms, conditions,

and privileges of employment.

163.   Defendant's have engaged in a *historical* pattern of wanton discriminatory

conduct toward women and minorities which is outrageous and extreme.   For example, Ms. Park

was: "belittled, sexually harassed, ridiculed, and subjected to derogatory remarks and made to

feel inferior in front of her peers by May, Foster, Daswani, Montoya, and Johnson as well as a

Third Party Vendor Defendant's staff Minter, Eternick, Vigil, Naylor, Ware, etc.

164.   Pursuant to federal and state common law, Ms. Park asserts defamation and

intentional infliction of emotional distress claims.

**NINTH CLAIM FOR RELIEF**
**American's with Disabilities Act ("ADA") of 1990, as amended, 42 U.S.C. § 1986,**
**42 U.S.C. § 12112 et seq.,**

165.   Plaintiff incorporates by reference paragraphs 1 to 164 as though fully alleged

herein.

166.   Ms. Park is a qualified person with a physical and mental disability, perceived to

have a disability, and/or has a record of a disability after 4/2/07 to present day.

167.   Defendant's intentionally failed to prevent or correct further discriminatory

treatment after reporting/opposed various incidents of discrimination prior to and on 8/31/07,

9/4/07, 8/14/08, and thereafter with Zimmerman with regard to Defendant's and TD

Ameritrade et al staff and of which Zimmerman witnessed Ms. Park experiencing intense

anxiety, panic attacks, depression, and breathing difficulties.

168.   Zimmerman's failure to eradicate <u>further</u> discrimination resulted in continued

Page 57   Civil Action No. 10-cv-00189-PAB-CBS

negligence and harm to Ms. Park's emotional and physical well-being upon Ms. Park's return

9/4/08 to TD Ameritrade et al and thereafter resulted in whole and/or part where Ms. Park has

been diagnosed with auto-immune disease, hyperthyroidism, and is inflicted with hand and brain

tremors, chronic anxiety and panic attacks, memory loss, clinical depression, stuttering, etc., as a

direct result of the toxic and flagrant discrimination work environment at Defendant's workplace

and TD Ameritrade et al.  **Exhibit 26**

Furthermore, a debacle of vile discrimination, willful, planned, and concerted acts of retaliation

by supervisors, team leads, and staff for reporting 8/14/08, hostile work environment, sexual

harassment, racial and ethnic harassment, threats, was executed upon Ms. Park without relent

from 4 levels of supervision, 2 levels of HR, and the President and Chairman of the Board closed

their eyes while Ms. Park was "emotionally backed into a corner" and "kicked until her visage

was so marred she was unrecognizable as a human being" at TD Ameritrade et al.

169.    Plaintiff is on extended disability and under the care of a Therapist and

Psychiatrist. Ms. Park's health has further deteriorated as a TD Ameritrade et al staffer to the

point when she is having hand and brain tremors due to the chronic stress and toxic hostile work

environment resulting in severe anxiety panic attacks, depression, nausea, vomiting, fear,

stuttering, etc.

170.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, is a

violation of Title VII laws and Ms. Park alleges that she was inflicted with flagrant emotional

distress due to continuous egregious acts of Defendant's staff, supervisors, managers, human

resources, as well as Yabuki and Beriault. Ms. Park also alleges that the actions of her staff

and supervisors as well as Defendant's Third Party Supervisor Ware, Eternick, Vigil, Minter, and

Page 58   Civil Action No. 10-cv-00189-PAB-CBS

others created a hostile work environment that ultimately resulted in her taking a leave of

absence of Short Term Disability and which in turn led to her subsequent <u>extended</u> Short-

Term Disability 12/4/09 due to the extremity of prior acts of hostile work environment, implied

and actual threats, sexual, racial and ethnic-charged work environment, with no <u>reliable</u> agent,

supervisor, or HR to report discrimination, etc. to.

### TENTH CLAIM FOR RELIEF
### Fraud and 42 U.S.C. § 1985

171.   Plaintiff incorporates by reference paragraphs 1 to 170 as though fully alleged

herein.

172.   Defendant's were negligent in their management of Plaintiff and elected to

commit civil conspiracy due to actions, perjury, positions taken to unlawfully benefit and protect

the Defendant's and not Ms. Park, nor the laws of Title VII, nor Defendant's Code of Conduct,

nor the Employee Handbook.  Nor did Defendant's put safeguards in place with relation to

stopping email access to content that would propagate a racist, sexually charge workplace.

173.   The Defendant's concealed and/or misrepresented facts that "Twenty Reasons

Why I Hate Blondes" was emailed by supervisor May 9/07 and that Montoya did violate the laws

of Title VII with relation to racist National Origin mocking and intimidation based on Indian

Dialect thus creating and maintaining a perverse and willingly, malicious hostile work

environment so that the adverse treatment affected the terms, conditions, or privileges of Ms.

Park's employment.

174.   Plaintiff is now suffering and will continue to suffer irreparable injury and

monetary damages for mental anguish and humiliation as a result of Defendant's corporate

malfeasance and acts of fraud.

Page 59   Civil Action No. 10-cv-00189-PAB-CBS

175.    Defendant's are liable for aiding and abetting fraud and perjury and have acted intentionally and with malice and/or reckless indifference to Plaintiff's statutory rights.

176.    The Court shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

## PRAYER FOR RELIEF:

**WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:**

A.    All wages, salary, loss of earning capacity, and employment benefits which she would have received but for the violations by Defendant's;

B.    Compensatory damages to the full extent allowed by law, including, but not limited to those for past and future pecuniary losses and past and future nonpecuniary losses. Tangible and intangible injuries of emotional harm such as emotional pain, embarrassment, suffering, perpetual inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses include: fear for life and present psychological disability due to fear of present and former staff physically or emotionally harming Plaintiff, loss of health, chronic stress, blatant injuries to mental health, constant crying, chronic vomiting, migraines, humiliation, anger, excessive sleep and fatigue, severe anxiety, intense panic attacks, erratic breathing, depression, severe emotional distress, listlessness, memory loss, brain and hand tremors, anxious, loss of self-esteem, forced to endure chronic use of medicine even though this violated Plaintiff's religious beliefs that one should have to take anxiety and panic attack medicine, injury to professional standing, injury to character and reputation, loss of consortium, loss of society, irreparable harm, shame, other hedonic damages, other physical damages yet to

Page 60    Civil Action No. 10-cv-00189-PAB-CBS

be determined, and other related harms;

      C.     Punitive damages to the full extent allowed by law to thwart future acts of

discrimination and also due to the perpetual malice, gross negligence, extreme oppression,

wanton misconduct, evil motive or intent, reckless indifference and total disregard to the

federally protected rights of aggrieved Plaintiff;

      D.     Pre-judgment and post-judgment interest at the highest lawful rate; Post-

judgment interest on unpaid pre-judgment interest at the highest lawful rate;

      E.     Full compensation for back pay, interest on backpay, frontpay, or any relief that

would have been available under Title VII, § 505 of the Rehabilitation Act, or the ADA, without

inclusion in the caps.

      F.     Equitable relief for breach of employment contract;

      G.     Attorneys' fees; Costs and expenses of prosecuting this cause;

      H.     Any and all relief as allowed by law or the Court deems necessary and proper to

make Ms. Park whole.

## PLAINTIFF DEMANDS A JURY TRIAL

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a Trial

by Jury in this action.

Respectfully Submitted,

Lori L. Park
Pro Se Party
1120 32nd Street, Unit 101
Denver, CO  80205
(785) 200-5199
parkisgame@yahoo.com

Date 5/20/10